## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

DP WORLD DJIBOUTI FZCO
5th Floor, JAFZA 17, Jebel Ali Free Zone, PO
Box 17000, Dubai, United Arab Emirates

                   Petitioner,

               -against-

REPUBLIC OF DJIBOUTI,
Port de Djibouti, PO Box 197, Djibouti

                Respondent.

Index No.

## PETITION TO CONFIRM
## FOREIGN ARBITRATION AWARD

Pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "**New York Convention**"), as codified by the Federal Arbitration Act ("**FAA**"), 9 U.S.C. §§ 201-208, Petitioner DP World Djibouti FZCO ("**Petitioner**" or "**DP World**") hereby moves for the confirmation of the January 20, 2022 Third Partial Final Award (the "**Third Partial Final Award**") entered in favor of Petitioner and against Respondent the Republic of Djibouti (the "**Respondent**" or "**Djibouti**") in an arbitration proceeding conducted pursuant to the Rules of Arbitration of the London Centre for International Arbitration ("**LCIA**") and under the Concession Agreement between Djibouti and Doraleh Container Terminal SA ("**DCT**") and DP World on October 30, 2006 (the "**Concession Agreement**"). The Third Partial Final Award should be recognized, and a money judgment should be entered in Petitioner's favor against Djibouti in the amount of the Third Partial Final Award and for such other relief as the Court deems just and proper.

## INTRODUCTION

1.      This is an action under the New York Convention to confirm an arbitral award arising from a dispute regarding the construction and operation of a port facility in Djibouti.  In accordance with the Concession Agreement and a Management Services Agreement ("**MSA**") with DP World dated December 6, 2006, DP World constructed, developed, and managed a new container terminal facility at the Port of Doraleh under an exclusive concession with Djibouti, bringing a range of direct payments and indirect benefits to the Djiboutian economy.  The concession is held by DCT, a joint venture company between DP World and Djibouti's port company, Port de Djibouti SA ("**PDSA**").

2.      The container terminal, which is one of the most advanced and lucrative port facilities in Africa, was built and completed on schedule in accordance with the Concession Agreement at a cost of $427 million.  Djibouti violated various terms of the Concession Agreement and later enacted a law permitting the Djiboutian government to demand the renegotiation and termination of so-called "strategic infrastructure contracts."  Beginning in December 2017, the Djiboutian government invoked this law against DCT and DP World, eventually purporting to cancel the Concession Agreement, taking physical control of the Terminal, and expelling DP World's personnel from the country.

3.      Petitioner and DCT commenced an LCIA arbitration proceeding (LCIA No: 183886, the "**Arbitration**") to recover the damages caused by Respondent's violations of the Concession Agreement.  The Tribunal rendered a Third Partial Final Award in which it found that the Concession Agreement was valid and Djibouti's actions denied Petitioner's revenue and profits.  The Tribunal thus directed Djibouti to compensate Petitioner for the monetary loss suffered as a result of Djibouti's breaches.

4.      Petitioner now seeks to confirm this final and binding Third Partial Final Award

under the New York Convention.

## PARTIES

5.        Petitioner DP World is a logistics company specializing in cargo logistics and port terminal operations with an address of 5th Floor, JAFZA 17, Jebel Ali Free Zone, PO Box 17000, Dubai, United Arab Emirates.  DP World holds a minority 33.34% share interest in DCT.

6.        Both DCT and DP World were claimants in the Arbitration commenced against Respondent Djibouti.[1]  The Tribunal awarded DP World damages totaling $148,163,408, exclusive of interest.  Third Partial Final Award ¶ 134.[2]

7.        Respondent Djibouti is a "foreign state" within the meaning of 28 U.S.C. § 1330.

## JURISDICTION AND VENUE

8.        This is a proceeding to obtain recognition of a foreign arbitral award governed by the New York Convention.  The Arbitration was seated, and the Third Partial Final Award was rendered, in London, United Kingdom.  The Third Partial Final Award, which was issued in English, is attached to the accompanying Declaration of Debra O'Gorman ("**O'Gorman Decl.**")

---

[1]      Djibouti was also a claimant in a separate LCIA arbitration proceeding, LCIA No: 142732, commenced by Djibouti in 2014 (the "**2014 London Arbitration**"), the Djibouti Ports and Free Zones Authority ("**DPFZA**"), and PDSA, as claimants, against DCT, DP World, and Dubai (International) Djibouti FZE ("**Dubai International**"), as respondents.  The 2014 London Arbitration involved different claims arising under the Concession Agreement.

[2]      The Third Partial Final Award separately granted DCT damages and accrued interest against Djibouti for Djibouti's breach of Article 12.1.3 (vii) of the Concession Agreement. Djibouti recently appealed from a recognition judgment issued by this Court against it in a separate action brought by DCT to confirm the awards issued in the 2014 London Arbitration.  *Doraleh Container Terminal SA v. Republic of Djibouti*, No. 23-7023 (D.C. Cir.) (appealing order and judgment confirming arbitration awards issued in *Doraleh Container Terminal SA v. Republic of Djibouti*, 20-cv-25771 (D.D.C.) (the "**2020 Confirmation Proceeding**")).  In the appeal, Djibouti argues that Quinn Emanuel lacks authority to act for DCT without approval from DCT's purported provisional administrator.

as Exhibit A and is certified as a true and correct copy by the O'Gorman Decl.[3]

9.     The Court has subject matter jurisdiction over this action pursuant to Section 202 of the FAA, which provides, in relevant part, that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention[;]" and Section 203, which provides that "[a]n action or proceeding falling under the [New York] Convention shall be deemed to arise under the laws and treaties of the United States;" and, consequently, under 28 U.S.C. § 1331.   The Third Partial Final Award arose out of Petitioner's investments in Djibouti, a legal relationship that is commercial in nature, and therefore meets the criteria under the FAA.

10.     Further, Djibouti is not immune pursuant to Section 1605(a)(6)(B) of the FSIA because this is an action "to confirm an award made pursuant to … an agreement to arbitrate" and "the … award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards"–namely the New York Convention. *See Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26, 33 (D.D.C. 2016) ("The New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception [under 28 U.S.C. § 1605(a)(6)]." (citations and internal quotation marks omitted)).

11.     The Court also has subject matter jurisdiction over this action pursuant to Section 1605(a)(1) of the FSIA, which grants federal district courts subject matter jurisdiction over foreign states in cases "in which the foreign state has waived its immunity either explicitly or by

---

[3]     Prior to rendering the Third Partial Final Award, the arbitration tribunal had rendered a First Partial Award on July 31, 2018, and a Second Partial Award on January 10, 2020, determining certain liability issues. *Infra* ¶¶ 32, 36.

implication[.]"  Djibouti has waived its immunity from suit under Section 1605(a)(1), both by

acceding to the New York Convention and by agreeing to arbitrate disputes arising under the

Concession Agreement pursuant to LCIA Rules--thereby waiving immunity in relation to an

action to enforce an award in the United States.  *See Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C.

Cir. 2019) (holding that "a sovereign, by signing the New York Convention, waives its immunity

from arbitration-enforcement actions in other signatory states"); Concession Agreement, Art. 20 (a

copy of the Concession Agreement and its addendum are attached to the O'Gorman Decl. as

Exhibit B and Exhibit C).

12.     This Court may exercise personal jurisdiction over Respondent pursuant to 28

U.S.C. § 1330(b).  That section provides that this Court has personal jurisdiction over a foreign

state in an action with respect to which the foreign state is not entitled to sovereign immunity under

28 U.S.C. §§ 1605-1607 and where service has been made under 28 U.S.C. § 1608(a).

13.     Venue is proper in this court under 9 U.S.C. § 204 and 28 U.S.C. § 1391(f)(4),

which allows a civil action against "a foreign state" to be brought in the United States District

Court for the District of Columbia.

## FACTUAL BACKGROUND

### A.     THE CONCESSION AGREEMENT AND THE UNDERLYING DISPUTE

14.     Djibouti is strategically located at the mouth of the Red Sea—bridging Africa, the

Middle East, and the Indian Ocean.  Situated at one of the busiest shipping routes in the world, the

port of Djibouti naturally has become a principal maritime outlet for trade and serves as a key

refueling and transshipment center.

15.     In the late 1990s, Djibouti identified the need to upgrade and develop its antiquated

port facility.  In 2004, Djibouti granted DP World an exclusive concession to construct, develop,

and manage a new container terminal facility at Doraleh.  A special purpose joint venture company,

DCT, was created to hold the concession.  PDSA held 66.66% of the shares in DCT, while DP World held 33.34% of the shares and had the right to appoint a majority of its Directors.  DCT also entered into a MSA with DP World dated December 6, 2006, under which DP World was to perform various management services and be paid a management fee.

16.     In October 2006, Djibouti and DCT entered into a Concession Agreement.  The Concession Agreement gave DCT the exclusive right, for a 30-year period (plus two further 10-year extensions), to develop, construct, manage, and operate the Terminal.  Concession Agreement, Art. 4.1.  The Concession Agreement entitled Djibouti to annual royalties on port revenues, and Djibouti and DP World were both entitled to a share of DCT's profits in proportion to their respective shareholdings.  *Id*. Art. 11.

17.     The Concession Agreement confers certain rights to DP World as a shareholder of DCT and "Concessionaire."  Article 3.7 provides that "[Djibouti] shall and shall cause [DPFZA]… to ensure that no steps or action (whether through an act or by omission) are taken by it/them which results in or would result in the Shareholders … being deprived or substantially deprived of their investment or economic interest in the Concession."  *Id*. Art. 3.7.

18.     The Agreement further confers to DCT and its shareholders and managers a list of "exemptions and benefits."  *Id*. Art. 12.1.3.  As relevant here, these "exemptions and benefits" include:

> (vi) Freedom to conduct all industrial and commercial activities in accordance with the terms of this Agreement;

> (vii) Exemption from nationalization or any restrictive measures with respect to ownership of private property and the guarantee of private ownership of the Concessionaire's assets.

*Id*.

19.     The Concession Agreement also includes a notice provision, which states:

> Unless otherwise stated, notices to be given under this Agreement . . . shall be in writing and shall be given by hand delivery, recognized international courier, mail, telex or facsimile transmission and ***delivered or transmitted to the Parties at the addresses set forth in the Parties clause above***, or such other address, telex number, or facsimile number as may be duly notified by the respective Parties from time to time, and shall be deemed to have been made or delivered: (i) in the case of any communication made by letter, when delivered by hand, by recognized international courier or by mail (registered, return receipt requested) at that address; and (ii) in the case of any communication made by telex or facsimile, when transmitted properly addressed to such telex number or facsimile number."

*Id*. Art. 22.5.

20.     The "Parties clauses" referred to in Article 22.5 state that Djibouti is "represented herein by the Chairman, Djibouti Ports and Free Zones Authority … having its office at Djibouti Free Zone P.O BOX 197 Djibouti." *Id*. at Art. 22.5. The Chairman of Djibouti Ports and Free Zones Authority is Mr. Aboubaker Omar Hadi. Third Partial Final Award ¶ 70.

21.     Article 20 of the Concession Agreement provides for arbitration of any dispute under LCIA Rules if the dispute cannot be amicably settled and that any resulting award shall be "final and binding" and "enforced against the Parties." Concession Agreement, Art. 20. It further provides that "judgement upon the Arbitral Award may be entered in any court having jurisdiction thereof." Section 20.2 provides in relevant part:

> 20.2.1 Arbitrators
>
> Failing amicable settlement and/or settlement the dispute or differences or claims, as the case may be, shall be finally settled by binding Arbitration under the Rules of Arbitration of the London Centre for International Arbitration by a sole arbitrator appointed in accordance with the said Rules.

*Id*. Art. 20.2.1.

> 20.2.4 Enforcement of Award

> Any decision or award resulting from Arbitration shall be final and binding upon the Parties. The Parties hereto, hereby waive, to the extent permitted by law, any rights to appeal or to review of such Award by any court or tribunal. The Parties hereto, agree that the Arbitral Award may be enforced against the Parties to the Arbitration proceeding or their assets, wherever they may be found, and that a judgement upon the Arbitral Award may be entered in any court having jurisdiction thereof.

*Id*. Art. 20.2.4.

22.     The Terminal was built on schedule in accordance with the Concession Agreement and opened in February 2009.  Pursuant to the MSA, DP World managed the day-to-day operations at the Terminal.  The Terminal, which is among the most advanced port facilities in Africa, has been very profitable and brought a range of indirect benefits to the Djiboutian economy such as improvements to the local employment, infrastructure building, foreign investment, and the country's GDP.

## B.     DJIBOUTI'S ATTEMPTS TO REVOKE THE CONCESSION AGREEMENT

23.     Djibouti reaped enormous profits from the Terminal through the annual royalties and port revenues it was entitled to under the Concession Agreement.  These included both the higher of $6 million in annual royalties or 5% of port revenues, and a share of DCT's profits.  Yet Djibouti wanted to back out of the deal.  In 2014, Djibouti commenced the 2014 London Arbitration seeking to rescind the Concession Agreement and absolve itself of its contractual obligations on the grounds that the Concession Agreement was procured through bribery and corruption.  The tribunal in the 2014 London Arbitration dismissed Djibouti's claim in February 2017.  During 2017 and into 2018, the parties attempted to amicably resolve their unaddressed counterclaims, but were unsuccessful.  On November 9, 2018, an arbitration hearing on the counterclaims took place.

24.     A few months later, Djibouti enacted a law empowering itself to demand the renegotiation of so-called "strategic infrastructure contracts" and to terminate them unilaterally should renegotiation attempts fail ("**Law 202**").  The Djiboutian government then promptly invoked Law 202 against DCT and DP World demanding that the Concession Agreement—which had just been found to be valid and binding in the 2014 London Arbitration--be renegotiated.

25.     On February 22, 2018, the President of Djibouti issued several decrees to ostracize DP World, including a decree to terminate the Concession Agreement purportedly under Law 202. That decree also purported to restore the management of the Terminal at Doraleh back to Djibouti, despite DP World's entitlement to such management activities and related fees under the MSA. That same day, Djibouti took physical control of the Terminal and expelled all non-Djiboutian personnel of DCT and DP World from Djiboutian territory.  It also seized control of DCT's assets, including all physical infrastructure comprising the Terminal and DCT's onshore bank accounts.

26.     On September 25, 2018, DCT's directors called for a Board Meeting to approve the 2017 accounts for DCT and determine the dividends to be distributed to DCT's shareholders, PDSA, and DP World.  The next day, Djibouti applied to the Djiboutian Court of First Instance *ex parte* for the appointment of a temporary administrator over DCT.  The application was granted a day later and Djibouti's handpicked "temporary administrator," Ms. Chantal Tadoral, was purportedly appointed.  Ms. Tadoral notified DP World of her appointment on September 30, 2018, and cancelled DCT's planned Board Meeting.

27.     On November 27, 2018, DP World sent a notice to PDSA calling a shareholder's meeting to approve the dividend.  Djibouti's counsel responded on behalf of PDSA asserting that it was the exclusive responsibility of the newly appointed administrator to finalize DCT's annual financial statements and to convene the shareholder's meeting.

28.     On March 29, 2019, the tribunal in the 2014 London Arbitration issued an award in favor of DCT on its counterclaims against Djibouti for Djibouti's breaches of the exclusivity provision and failure to pay royalty due under the Concession Agreement.  That award and a subsequent award granting DCT accrued interest on damages were recently confirmed and converted to money judgment by this Court in the 2020 Confirmation Proceeding.  In confirming the awards, this Court held that it had subject matter jurisdiction over DCT's petition against Djibouti and rejected Djibouti's defenses under the New York Convention--including that it was not given proper notice during the arbitration proceedings and enforcing the award would violate U.S. public policy.  2020 Confirmation Proceeding, Dkt. 44 at 5-15.  Djibouti's appeal from that recognition judgment is currently pending before the Court of Appeals.  *Doraleh Container Terminal SA v. Republic of Djibouti*, No. 23-7023 (D.C. Cir.).

C.     **THE ARBITRATION**

29.     Under Article 20 of the Concession Agreement, a dispute shall be settled by binding arbitration if the parties cannot resolve it amicably.  Concession Agreement, Art. 20.

30.     In January 2018, the parties met and were unable to resolve their dispute as to Djibouti's demands to renegotiate the Concession Agreement.  In February 2018, DCT and DP World issued a Notice of Dispute to Djibouti and, shortly thereafter, commenced the Arbitration at the LCIA.  Specifically, DCT and DP World sought as a "Preliminary Issue" a declaration from the Tribunal that the Concession Agreement remains valid and binding notwithstanding Djibouti's enactment of Law 202.

31.     On February 28, 2018, the Tribunal issued a Procedural Order determining that documents in the Arbitration "shall be served electronically…on [Djibouti] at the address: aboubakeroh@dpfza.gov.dj."  The email address belongs to Mr. Aboubaker Omar Hadi, Chairman of the DPFZA.  The Tribunal was satisfied that service on Mr. Hadi would give Djibouti proper

notice since Mr. Hadi was Djibouti's representative under the Concession Agreement and had previously communicated matters relating to the Concession Agreement with DP World by using the same email address.

32.     Despite receipt of DCT and DP World's written submissions on the Preliminary Issues, Djibouti chose not to make any submission.  On July 31, 2018, the Tribunal issued the First Partial Award declaring that it has jurisdiction over the dispute at issue and that the Concession Agreement remains valid and binding.

33.     On February 26, 2019, DCT and DP World filed their Statement of Case, seeking declaration that the implementation of the February 22, 2018, presidential decrees violated numerous provisions under the Concession Agreement.

34.     On January 10, 2020, the Tribunal issued a Second Partial Award ordering the Republic "to perform all its obligations under the 2006 Concession Agreement and in doing so, by any means of its own choosing, restore to [DCT and DP World] all their rights and benefits under the 2006 Concession Agreement" in two months from the issuance of the Second Partial Award. Third Partial Final Award ¶ 10.  The deadline was then extended twice until December 10, 2020. *Id*. ¶¶ 12, 13.

35.     The Tribunal further held that, although DP World is not a party to the Concession Agreement, it is entitled to invoke the arbitration clause under the Agreement as a "Shareholder" of DCT pursuant to Articles 3.7 and 12.1.3 of the Agreement.

36.     On February 19, 2021, DCT and DP World informed the tribunal in writing of Djibouti's failure to comply with the Second Partial Award.  *Id*. ¶ 16.  On April 9, 2021, DCT and DP World filed their Supplementary Statement of Case, seeking damages for the accumulated losses as a result of Djibouti's various breaches of the Concession Agreement.  *Id*. ¶¶ 17, 20.

37.     On January 20, 2022, the tribunal rendered the Third Partial Final Award, finding Djibouti liable to DP World for monetary damages due to breaches of Articles 3.7 and 12.1.3(vi) of the Concession Agreement—

(a) **DP World's Loss of Management Fees:** DP World was deprived of its right to conduct the managerial activities memorialized in the MSA due to the presidential decree, which was a breach of Article 12.1.3.(vi) of the Concession Agreement. *Id.* ¶¶ 90, 95. As a result, DP World incurred $31,390,693 in lost management fees for the period February 23, 2018, to December 31, 2020. *Id.* ¶¶ 91, 95.

(b) **DP World's Loss of Dividends**: DP World was deprived of $116,772,715 in dividends pursuant to Articles 3.7 and 12.1.3(vi) of the Concession Agreement as a result of Djibouti's interference with DCT's corporate affairs, including Djibouti's attempted annulment of the Resolution of DCT's Board of Directors; the appointment of the interim administrator; and use of the administrator to block payment of dividends to DP World. *Id.* ¶¶ 54, 58, 63, 103.

38.     Djibouti continued to ignore the tribunal's directive and refuse participation in the arbitration proceeding, despite its receipt of all correspondence, pleadings, and other materials relating to the Arbitration. *See, e.g., id.* ¶¶ 18, 19, 23, 25, 28, 34, 37, 39.

39.     As of today, Djibouti has not paid any portion of the Third Partial Final Award.

## REQUEST FOR THE RECOGNITION AND
## CONFIRMATION OF THE THIRD PARTIAL FINAL AWARD

40.     Petitioner repeats and re-alleges paragraphs 1 through 39.

41.     The parties' agreement to arbitrate is found in Article 20 of the Concession Agreement, which constitutes a valid "agreement in writing" for purposes of Article II of the New

York Convention.

42.     The Third Partial Final Award was rendered in an arbitration seated in the United Kingdom, which is a party to the New York Convention.  Djibouti and the United States are also parties to the New York Convention.  *See* New York Convention, Art. I.  The Third Partial Final Award arose from a legal relationship between Petitioner and Respondent that is commercial within the meaning of Section 202 of the FAA, and the relationship is not "entirely between citizens of the United States."

43.     The Third Partial Final Award is final and binding within the meaning of the New York Convention and Section 207 of the FAA and is therefore binding on the parties and subject to recognition and enforcement in the United States pursuant to the New York Convention and the FAA.

44.     The FAA and the New York Convention make recognition and enforcement mandatory except where any of certain narrow defenses are proven.  *See* New York Convention, Arts. III & V; 9 U.S.C. § 207 (the "court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention"); 2020 Confirmation Proceeding, Dkt. 44 at 11.    None of the defenses to the enforcement of an arbitral award are applicable here.  *See id.* at 12-15 (rejecting Djibouti's arguments that it did not receive proper notice during the 2014 Arbitration Proceedings and that enforcing the awards would violate U.S. public policy).  There are also no grounds to correct or vacate the Third Partial Final Award.  Accordingly, none of the grounds for refusal or deferral of the Third Partial Final Award set forth in Article V of the New York Convention apply.

45.     Petitioner intends to commence the process of providing notice of this Petition in accordance with the notice provision in the Concession Agreement and the FSIA as soon as the

summons is issued. *See* O'Gorman Decl. ¶ 5; 28 U.S.C. § 1608(a)(1) ("Service in the courts of the United States . . . shall be made upon a foreign state . . . by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state."); *Marlowe v. Argentine Naval Com'n*, 604 F. Supp. 703, 707-08 (D.D.C. 1985) (service of summons and complaint by mail was proper under the FSIA because the contract between the plaintiff and the defendant foreign state has a special agreement for the mailing of all notices, requests, demands, or other communications).

46.     Petitioner is thus entitled to immediate confirmation, recognition, and enforcement of the Third Partial Final Award pursuant to Section 907 of the FAA and Article III of the New York Convention, and entry of a money judgment in favor of Petitioner and against Respondent in the full amount of the Third Partial Final Award, with interest and costs as provided therein accruing through the date of this Court's judgment.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court, pursuant to Article III of the New York Convention and Section 207 of the FAA:

47.     The Court enters judgment confirming the Third Partial Final Award, and adjudging Djibouti liable to DP World for money damages as follows:

1.  $31,390,693 for lost management fees under Article 12.1.3(vi) of the Concession Agreement.

2.  $1,775,755 as interest on Claimant's lost management fees that accrued as of the date of the Third Partial Final Award as well as interest on the principal amount at the rate of LIBOR plus 4% compounded annually until the award is paid.

3.  $116,772,715 for lost dividends under Articles 3.7 and 12.1 of the Concession Agreement.

4.  $14,655,792 as interest on Claimant's lost dividends that accrued as of the date

of the Third Partial Final Award as well as interest on the principal amount at the rate of LIBOR plus 4% compounded annually until the award is paid.

48.     Granting any other relief that this Court, in the interests of justice, deems necessary and proper.

Dated:  May 26, 2023

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: /s/ _____
        Dennis H. Hranitzky (Bar No. NY0117)

        2755 E. Cottonwood Parkway, Suite 430
        Salt Lake City, UT 84121
        801-505-7300 Main Office Number
        801-515-7400 FAX

        Debra O'Gorman (Bar No. NY0499)

        51 Madison Avenue, 22nd Floor
        New York, NY 10010
        212-849-7000 Main Office Number
        212-849-7100 FAX

*Attorneys for Petitioners*