# EXHIBIT A

IN THE MATTER OF AN ARBITRATION UNDER THE LCIA ARBITRATION
RULES (2014)

## DORALEH CONTAINER TERMINAL SA

## DP WORLD DJIBOUTI FZCO

*Claimants*

-v-

## REPUBLIC OF DJIBOUTI

*Respondent*

LCIA Arbitration No. 183886

_____

## THIRD PARTIAL FINAL AWARD
_____

20 January 2022

Before an Arbitral Tribunal comprising:

Prof. Zachary Douglas QC

LCIA Arbitration No. 183886
Third Partial Final Award

# **TABLE OF CONTENTS**

A    THE PARTIES ................................................................................................ 2

B    THE ARBITRAL TRIBUNAL ...................................................................... 3

C    PROCEDURE.................................................................................................. 3

D    FACTUAL BACKGROUND TO THE DISPUTE .................................... 10

E    RELIEF SOUGHT BY THE CLAIMANTS ............................................... 10

F    ARBITRATION AGREEMENT.................................................................. 11

G    THE RESERVED CLAIMS.......................................................................... 12

H    THE CLAIMANTS' CASE ON DAMAGES ............................................. 19

    H1    Introduction.................................................................................... 19

    H2    Overview of the Claimants' claim for accumulated losses between 22 February 2018 until 31 March 2021 ........................................................................... 23

    H3    Calculation of DCT's free cash flows between 23 February 2018 and 31 December 2020 ............................................................................................ 25

    H4    DPWD's damages claim for loss of management fees........................ 27

    H5    DPWD's damages claim for loss of dividends from DCT ................... 30

    H6    DCT's damages claim for losses resulting from the seizure of its onshore bank account 32

    H7    DCT's damages claim for lost cash flows representing the lost dividends due to PDSA ........................................................................................................ 35

    H8    The Claimants' claim for interest ........................................................ 39

I    AWARD .......................................................................................................... 41

## A   THE PARTIES

1.   The claimants are DORALEH CONTAINER TERMINAL SA and DP WORLD DJIBOUTI FZCO with addresses in Port de Doraleh, BP 2081, République de Djibouti and 5th Floor, JAFZA 17, Jebel Ali Free Zone, PO Box 17000, Dubai, United Arab Emirates, respectively (hereinafter referred to as **DCT** and **DPWD** and jointly as the **Claimants**).  The Claimants are represented in these proceedings by Quinn Emanuel Urquhart & Sullivan LLP, 90 High Holborn, London WC1V 6LJ, United Kingdom.

2.   The respondent is the REPUBLIC OF DJIBOUTI, (the **Respondent** or the **Republic**), Djibouti Ports and Free Zone Authority, Port de Djibouti SA, PO Box 198, Djibouti Free Zone, Djibouti.  The Respondent has not, to date, participated in the proceedings.

3.   The Claimants and the Respondent are referred to collectively as the **Parties**.

4.   The dispute arises out of a Concession Agreement, dated 30 October 2006, stated to have been made between the Republic of Djibouti, as "*Grantor*", DCT, as "*Concessionaire*", and Dubai International (Djibouti) FZE, as "*Confirming Party*", as amended by an "*Addendum*", dated 22 May 2007, stated to have been made between the Republic of Djibouti, as "*Grantor*", DCT, as "*Concessionaire*", and DPWD, as "*Confirming Party*" (the **2006 Concession Agreement** and **Addendum of 22 May 2007**).  The 2006 Concession Agreement concerns the ownership, operation and management of a container terminal at Doraleh in Djibouti (the **Terminal**).

5.   This is the Tribunal's Third Partial Final Award in this arbitration.  In its First Partial Final Award, the Tribunal ruled, *inter alia*, that:

> The 2006 Concession Agreement remains valid and binding notwithstanding Law 2002 and the 2018 Decrees.[1]

6.   The Tribunal, in its Second Partial Final Award, declared that the Respondent had breached a number of obligations under the 2006 Concession Agreement both towards DCT and DPWD and made, *inter alia*, the following orders:

---

[1]   First Partial Final Award, §145.

Orders the Respondent to perform all of its obligations under the 2006 Concession Agreement and in doing so, by any means of its choosing, restore to the Claimants all their rights and benefits under the 2006 Concession Agreement.[2]

[…]

If the Respondent has not, by any means of its choosing, restored to the Claimants all their rights and benefits under the 2006 Concession Agreement upon the expiry of two months from the date of this issuance of this Second Partial Final Award, the Tribunal will proceed to assess the compensation (if any) owed by the Respondent to the Claimants as a result of the Respondent's breaches of the 2006 Concession Agreement (the deadline may be extended at the discretion of the Tribunal)[.][3]

7.    The Respondent has not, "*restored to the Claimants all their rights and benefits under the 2006 Concession Agreement upon the expiry of two months*" from the issuance of the Second Partial Final Award and hence the Tribunal now renders this Third Partial Final Award on the Claimants' claims for damages for losses said to have occurred since 22 February 2018 as a result of the Republic's breaches of the 2006 Concession Agreement.

## B    THE ARBITRAL TRIBUNAL

8.    The sole arbitrator (hereinafter referred to as the ***Tribunal*** or the ***Sole Arbitrator***) is Professor Zachary Douglas QC, Matrix Chambers, 15 Rue du Général-Dufour, 1204 Geneva, Switzerland.

## C    PROCEDURE

9.    The procedural history of this arbitration from its inception to the issuance of the Second Partial Final Award was set out in detail in Part C of the Second Partial Final Award.  Only the procedural steps taken after the issuance of the Second Partial Final Award are thus recorded here.

10.   The Tribunal's Second Partial Final Award was issued on 10 January 2020.  In accordance with paragraph 362.8 of that Award, the Republic was ordered "*to perform*

---

[2]    Second Partial Final Award, §362.8.

[3]    Second Partial Final Award, §363.1.

*all its obligations under the 2006 Concession Agreement and in doing so, by any means of its own choosing, restore to the Claimants all their rights and benefits under the 2006 Concession Agreement*".  Further to paragraph 363.1 of the Award, the deadline for compliance with this order was fixed as two months from the date of the issuance of the Award (i.e. 7 March 2020).

11.   On 16 January 2020, the Tribunal wrote to the Parties proposing to convene a short hearing after 7 March 2020 to deal with any consequential matters that might arise depending on whether the Respondent duly complied with the aforementioned order.  The Claimants requested further time to reflect on these matters on 24 January 2020 and the Tribunal acceded to that request on 30 January 2020.

12.   On 10 March 2020, the Claimants requested a further extension until 10 June 2020 to propose dates and an agenda for a hearing dealing with consequential matters. The Tribunal then requested a clarification on 11 March 2020 as to whether it was the Claimants' position that the deadline for the Republic's compliance with the order for specific performance in the Second Final Partial Award should be extended until 10 June 2020.  The Claimants confirmed that that was their position on 12 March 2020.  The Tribunal invited comments from the Respondent but none were forthcoming.  The Tribunal then issued Procedural Order No. 3 on 20 March 2020, paragraph 9 of which provided as follows:

> Pursuant to paragraph 363.1 of the Tribunal's Second Partial Final Award dated 10 January 2020, the Tribunal hereby extends the period of time for the Respondent's compliance with the Tribunal's order in paragraph 362.8 of the said Award until 10 June 2020.

13.   On 10 June 2020, the Claimants informed the Tribunal that they were actively involved in discussions to resolve the dispute with, among others, China Merchants Port Holdings Limited, but that progress was being hampered due to the logistical difficulties created by COVID-19.  The Claimants requested that the time for the Republic to comply with the Tribunal's order be further extended until 10 December 2020.  The Tribunal invited comments from the Respondent on 11 June 2020 but none were forthcoming.  The Tribunal then issued Procedural Order No. 4 on 22 June 2020, which contained an order in paragraph 7 identical to paragraph 9 of Procedural Order No. 3 save that the deadline was extended until 10 December 2020.

14.     On 18 December 2020, the Tribunal wrote to the Parties observing that the deadline had now passed and requested their comments on the future conduct of the arbitration.

15.     The Claimants responded on 22 December 2020 and requested more time to provide their comments.

16.     On 19 February 2021, the Claimants wrote to the Tribunal in the following terms:

> To date, the Republic has not restored to the Claimants their rights and benefits under the 2006 Concession Agreement. While the Claimants remain optimistic of the Parties ultimately reaching a negotiated settlement, the Claimants are compelled to resume these proceedings and pursue damages against the Republic in an effort to recover their mounting losses.

17.     In the same letter, the Claimants noted that since 22 February 2018 they have affirmed the 2006 Concession Agreement "*and confirm their election to treat it as ongoing, notwithstanding the Republic is in continuing repudiatory breach of it*". The Claimants further stated that they would henceforth "*seek damages for accumulated losses caused by the Republic's breaches and failure/delay in performance of its obligations under the 2006 Concession Agreement*" and "*request the Tribunal's leave to amend and update their claims to that effect*". A proposed timetable to adjudicate this claim for damages was then set out in the letter.

18.     On 23 February 2021, the Tribunal invited the Respondent to make observations on the Claimants' procedural proposals. No such observations were received. On 2 March 2021, the Tribunal stated that it was prepared to adopt the schedule proposed by the Claimant for the consideration of its claim for damages and requested the parties to indicate their availability for a one-day hearing by video conference in respect of the same. Following further exchanges concerning the date for the virtual hearing, the date was ultimately fixed for 29 June 2021.

19.     On 24 March 2021, the Claimants requested adjustments to the procedural timetable for adjudicating their claim for damages. The Tribunal invited the Respondent's observations on 28 March 2021. No observations were forthcoming and the Tribunal approved the adjustments.

20. On 9 April 2021, the Claimants filed: (i) Claimants' Supplementary Statement of Case dated 9 April 2021; (ii) Claimants' Updated Chronology dated 9 April 2021; (iii) Factual Exhibits marked C-150 to C-155; (iv) Legal Authorities marked CLA-110 to CLA-114; and (v) Third Expert Report of Compass Lexecon dated 9 April 2021, together with accompanying exhibits CLEX-46 to CLEX-49.

21. On 1 June 2021, the Tribunal's experts filed: (i) Second Report of David Cross and Geoffrey Senogles; and (ii) Exhibits SC-04 to SC-10.

22. On 14 June 2021, the Tribunal wrote to the Parties concerning the logistical arrangements for the hearing and requested a proposal for the agenda.

23. On 21 June 2021, the Claimants confirmed that they had made the logistical arrangements for the hearing and had provided information concerning those arrangements to the Respondent as per the Tribunal's instructions.

24. On 22 June 2021, the Tribunal confirmed that the Claimants' proposed agenda for the hearing would be adopted subject to the Respondent's participation at the hearing. The Tribunal also requested that the Parties address four enumerated questions during their oral submissions at the hearing. Those questions are reproduced below:

> The Claimants state that they "*continue to affirm the 2006 Concession Agreement and confirm their election to treat it as ongoing, notwithstanding the Republic is in continuing repudiatory breach of it*" (paragraph 15 of Claimants Supplementary Statement of Case). Has the Claimants' position been communicated to the Republic of Djibouti otherwise than in this arbitration? The Tribunal recalls DPWD's letter of 1 March 2018 (C-109). The Tribunal requests that any correspondence since that date moving between the Claimants and the Republic concerning the legal status of the obligations under the 2006 Concession Agreement be put on the record of the arbitration (unless it is without prejudice correspondence).

> The Claimants have referred to paragraph 24-010 of Chitty on Contracts (CLA-114) (see footnote 9 of Claimants Supplementary Statement of Case). That paragraph refers to two additional principles. First, "*if the innocent party is unable to complete the contract without the cooperation of the other party, his only remedy is to sue for damages and not for the contract sum*". Second, "*the innocent party cannot continue to hold the contract open in a case where the contractual purpose of the adventure has been frustrated such that further performance of the contract is either impossible or would be something radically different from what had been*

*agreed by the parties at the time of entry into the contract.*"  Both principles are supported by reference to cases.  Does either principle apply in the circumstances of the present case?

The Claimants note that "*[o]nce affirmed, the contract remains in force until it has been terminated for breach so that the innocent party who elected against termination remains bound to perform his own obligations*" and state: "*In that respect, the Claimants' have at all times attempted to perform their own obligations so far as possible, such as pursuing DCT's legal rights to enforce the terms of the 2006 Concession Agreement, attempting to declare/distribute dividend to DCT's shareholders (including for 2017, before the Terminal was seized), usage of DP World proprietary IT systems, and securing insurance for the Terminal.*" (paragraph 22 of Claimants Supplementary Statement of Case).  The evidence relied upon for this statement is Mr Al Banna's Witness Statement, which is dated 24 February 2019.  The Tribunal requests more contemporary evidence for the statement quoted above in relation to the Claimants' continuing performance, or attempts to perform, their obligations under the 2006 Concession Agreement.

The Claimants should be prepared to address the relationship between the requests of relief formulated in respect of the Second Claimant (paragraph 40(b) of Claimants Supplementary Statement of Case) and the First Claimant (paragraph 40(c)).  On the hypothesis that relief is granted to the Claimants, is it envisaged that there should be a delay between an order under paragraph 40(b) and an order under paragraph 40(c)?  How is double recovery to be avoided?

25.    On 23 June 2021, the Claimants circulated an electronic link to the hearing bundle to the Tribunal and to the Respondent and provided further details of the transcription service for the hearing as well as the virtual platform.

26.    On 29 June 2021, the Claimants filed their Written Responses to the Tribunal's questions set out in its letter of 22 June 2021, as well as factual exhibits C-156 and C-157, and legal authorities CLA-114 to CLA-117.

27.    A hearing on quantum issues took place virtually at 1pm (London time) on 29 June 2021.  It concluded at 4.30pm (London time).  The logistics for the virtual hearing were organised by the IDRC in London and both parties, as well as Tribunal and its experts, had previously received links to join the hearing by Zoom.  The hearing was attended by the following persons:

**Tribunal**
Professor Zachary Douglas QC

**Claimants**
Mr Ted Greeno
Mr Anthony Sinclair
Mr Jagdish Menezes
*Quinn Emanuel Urquart & Sullivan LLP*

Pablo Spiller
Carla Chavich
Jack Ghaleb
*Compass Lexecon*

**Tribunal's Experts**
Mr Geoffrey Senogles
Ms Svetlana Ksenofontova
*Senogles & Co*

Mr David Cross

28. The Respondent did not attend the hearing despite being invited to do so.

29. The Claimants circulated by email the presentation used by Compass Lexicon at the hearing on 29 June 2021.

30. On 29 June 2021, the Tribunal sent a letter to the Parties setting out the timetable for further submissions.

31. On 1 July 2021, the Claimants circulated a final transcript of the hearing that took place on 29 June 2021 to the Tribunal and to the Respondent and confirmed that a hard copy of the transcript would be couriered separately to the Respondent.

32. On 9 July 2021, the Claimants sent their Amended Request for Relief and confirmed that they would not be seeking costs at this stage of the proceedings.  They also filed the Fourth Expert Report of Professor Spiller and Ms Chavich together with exhibits CLEX-50 and CLEX-51.

33. On 17 September 2021, the Tribunal circulated to the Parties an "*Observations Note of Quantum*" prepared by the Tribunal's experts, Messrs Cross and Senogles and invited the Parties to make proposals on the subsequent steps of the proceedings.

34. The Claimants provided their proposals for the subsequent steps of the proceedings on 24 September 2021.  No proposal from the Respondent was forthcoming. The Tribunal invited the Respondent to comment on the Claimants' proposals.  The

Respondent did not to so.  On 4 October 2021, the Tribunal elected to adopt the Claimants' procedural proposals, which are set out below:

> *The Claimants propose that the Parties be given an opportunity to respond to the Observations of the Tribunal-appointed experts.  Subject to the Tribunal's directions in this respect, the Claimants intend to file a short submission, accompanied by a responsive report by Dr Pablo Spiller and Ms Carla Chavich, limited to the few points on which there remains disagreement.*
>
> *Due to present constraints regarding the availability of Claimants' legal team and Dr Spiller and Ms Chavich, the Claimants request that the Tribunal grant the Parties until <u>Friday, 12 November 2021</u>, to file their response.*
>
> *The Claimants do not require to make any further points in oral submissions.  However they are available should the Tribunal wish to convene a hearing.*
>
> *After the pleadings have been completed, the Tribunal is respectfully requested to issue a Partial Final Award to cover this phase of the arbitration.*

35.    On 12 November 2021, the Claimants filed their submissions, together with the Fifth Expert Report of Professor Spiller and Ms Chavich and Exhibit CLEX-52.

36.    On 17 November 2021, the Tribunal invited the Respondent to file any observations it may wish to make in relation to the documents filed by the Claimants on 12 November 2021 on or before 1 December 2021.  No observations were filed.

37.    On 24 November 2021, the Tribunal requested the Parties' assistance in relation to the issue of whether or not it was necessary to rule upon DPWD's claims that were reserved for subsequent determination in the Second Partial Final Award as a predicate to dealing with the quantum issues raised in this phase of the proceedings (the **Reserved Claims**).  The Claimants responded on 2 December 2021.  It was their position that the Tribunal could rule upon the quantum issues without deciding upon DPWD's Reserved Claims in so far as the Tribunal's decision on liability in respect of the other claims advanced by DPWD in the Second Partial Final Award provided the necessary predicate for the quantum issues relating to DPWD.  No response to the Tribunal's letter was forthcoming from the Respondent.

38.    On 5 December 2021, the Tribunal ruled that it would be procedurally expedient to rule upon DPWD's Reserved Claims at the same time as the quantum issues in a Third Partial Final Award.  It therefore invited further written submissions from the

Parties on these Reserved Claims and proposals for the schedule of those submissions.

39.    On 8 December 2021, the Claimants submitted a proposal for the schedule of the further written submissions, whereby the Claimants would file their submission on 17 December 2021 and the Respondent would file its reply on 7 January 2022.  The Tribunal invited the Respondent to comment upon this proposal.  No response was forthcoming and so, on 13 December 2021, the Tribunal endorsed the Claimants' procedural proposal.

40.    On 18 December 2021, the Claimants filed their written submission on DPWD's Reserved Claims together with exhibits.  No reply submission was filed by the Respondent on 7 January 2022 or thereafter.


## D    FACTUAL BACKGROUND TO THE DISPUTE

41.    The Tribunal refers to its full account of the factual background to the dispute in Part D of the Second Partial Final Award.


## E    RELIEF SOUGHT BY THE CLAIMANTS

42.    The Claimants' final request for relief in this phase of the arbitration was set out as an annex to its letter to the Tribunal of 9 July 2021:

> (a) DECLARE that the Respondent is liable to compensate the Claimants for losses caused by its breach of the 2006 Concession Agreement in the period from 22 February 2018 until 31 March 2021;
>
> (b) ORDER the Respondent immediately and without delay to compensate the Second Claimant with respect to its liability arising from the Second Claimant's claims:
>
> > (i) for its lost management fees between 23 February 2018 to 31 December 2020, in the total nominal amount of US$ 31.4 million, together with pre-Award compound interest at the rate of 12.2 percent, in the amount of US$ 0.9 million as at 31 March 2021, or at such other rate as the Tribunal sees fit;
>
> > (ii) for its lost dividends between 1 January 2017 to 31 December 2020, in the total nominal amount of US$ 116.8 million, together with pre-Award compound interest at the rate

of 12.2 percent, in the amount of US$ 21.0 million as at 31 March 2021, or at such other rate as the Tribunal sees fit; and

payable at the demand of the Second Claimant to an account nominated by it to receive such payment;

(c) ORDER the Respondent immediately and without delay to compensate the First Claimant with respect to its liability arising from the First Claimant's claims:

(i) for the losses resulting from the seizure of the First Claimant's onshore bank account at Banque pour le Commerce et l'Industrie - Mer Rouge (BCIMR), Djibouti, by the Respondent, on or around 22 February 2018, in the total amount of US$ 35.1 million (representing DCT's cash balance in the counterfactual as of 31 March 2021 net of costs and dividend payments);

(ii) for the lost cash flows representing the lost dividends due to Port de Djibouti S.A. (PDSA), between 1 January 2017 to 31 December 2020, in the total nominal amount of US$ 233.5 million, such sum when received to be earmarked by the Board of the First Claimant for the purpose of the payment of such dividends;

payable at the demand of the First Claimant to the First Claimant's bank account held at Standard Chartered Bank in London, United Kingdom; and

(d) ORDER under Section 49 of the Arbitration Act 1996 and Article 26.4 of the LCIA Rules that the Respondent pay the Claimants compound interest on all sums awarded in this Partial Final Award at the rate of 12.2 percent, from the date on which payment is due to the Claimants under the Award until payment, or alternatively, interest at such rates and with such rests as it considers meets the justice of the case.

43. The Respondent has taken no step in these proceedings and has not, therefore, made any request for relief.

## F    ARBITRATION AGREEMENT

44. The arbitration agreement is contained in Article 20 of the 2006 Concession Agreement and its scope and effect was considered in the Tribunal's First Partial Final Award.

## G   THE RESERVED CLAIMS

45.   The procedural path to the Tribunal's consideration of the Claimants' claims that were reserved in the Second Partial Final Award is set out in Section C above.

46.   In its Second Partial Final Award, the Tribunal concluded that DPWD was entitled to advance claims in respect of the benefits conferred upon it as a "*Shareholder*" pursuant to Articles 3.7 and 12.1.3 of the 2006 Concession Agreement and as the "*Manager*" pursuant to Article 12.1.3(vi) of the same agreement by virtue of the Contracts (Rights of Third Parties) Act 1999.[4]

47.   Article 3.7 provides:

> In recognition of the investment to be made by the Shareholders and the Financiers and subject to material compliance by the Shareholders and the Financiers with all Applicable Laws and the terms of this Agreement, the Grantor shall and shall cause the Authority and PAID to ensure that no steps or action (whether through an act or by omission) are taken by it/them which results in or would result in the Shareholders or the Financiers being deprived or substantially deprived of their investment or economic interest in the Concession.

48.   A "*Shareholder*" is defined in Article 1.1 of the 2006 Concession Agreement as "*any one or more… of the equity holders of the Concessionaire [DCT]*".  The definition then names "*DPW or any of its Affiliates*" as one of the Shareholders at the Effective Date. Annexure 2 to DCT's Articles of Association records that DPWD is a shareholder of DCT.[5]

49.   Article 12.1.3(vi) of the 2006 Concession Agreement provides:

> Without prejudice to the generality of the provisions of Article 12.1.1 above, the Grantor agrees that the Concessionaire, its Shareholders, Contractors, sub-concessionaires, Manager, sub-contractors, their agents and expatriate personnel shall at a minimum be entitled to the following exemptions and benefits throughout the Concession Period:
>
> […]

---

[4]   Second Partial Final Award, §200.

[5]   C-4, DCT Articles of Association dated 22 May 2007.

(vi) Freedom to conduct all industrial and commercial activities in
accordance with the terms of this Agreement[.]

50.   In relation to its benefits as a Shareholder, DPWD advanced four separate claims
for breach of Article 3.7.[6]  The fourth claim related to DPWD's alleged deprivation
of its entitlement to dividends.  The Tribunal stayed its consideration of that claim
and came to the same conclusion in relation to DPWD's claim for lost dividends
pursuant to Article 12.1.3(vi) and Article 12.1.3(vii).[7]

51.   In the dispositive section of the Second Partial Final Award, the Tribunal held at
paragraph 363.3:

> Consideration of DPWD's claim for breach of Article 3.7 of the
> 2006 Concession Agreement in respect of the fourth measure
> adopted by the Respondent (as set out in paragraph 300 of this
> Second Partial Final Award) and DPWD's claim for breach of
> Articles 12.1.3(vi) and 12.1.3(vii) as it relates to DPWD's rights as
> a "*Shareholder*" is stayed by the Tribunal until a subsequent phase
> of this arbitration[.]

52.   The "*fourth measure*" referred to in this paragraph was that the Republic had taken
steps "*to interfere with DCT's corporate affairs and appointed an Administrator over DCT*",
which has "*deprived DPWD of its dividend for 2017-2018*".[8]

53.   The elements of this claim were set out in the Claimants' Statement of Case[9] and
supported by the witness evidence of Mr Al Banna.[10]  The Claimants have provided
an update in respect of certain developments in its Submission on the Reserved
Claims of 17 December 2021.

54.   In summary, the Republic's interference with DCT's corporate affairs that resulted
in DPWD being deprived of its dividends is said to consist of the following:

54.1.   The attempted annulment of the Resolution of DCT's Board of Directors of
18 February 2018 and certain provisions of DCT's Articles that gave DPWD

---

[6]   Second Partial Final Award, §300.

[7]   Second Partial Final Award, §309.

[8]   Second Partial Final Award, §300.3.

[9]   Cs SoC, §§138-142, 145-149.

[10]   WS (Al Banna), §§46-50.

LCIA Arbitration No. 183886
Third Partial Final Award

control over DCT by filing a petition to the Djibouti Court of First Instance (the **Articles Proceedings**);[11]

54.2. The appointment of an interim administrator over DCT to act in lieu of its Board of Directors;[12] and

54.3. The use of the interim administrator to block the payment of dividends to DPWD for the year 2017.[13]

55. The Tribunal confirmed the evidential basis for these facts in its Second Partial Final Award.[14]  Since that Award was rendered, DPWD's appeal[15] to the Supreme Court of Djibouti against the decision of the Court of Appeal[16] upholding the first instance court's[17] rejection of DPWD's jurisdictional challenge is still pending.  (It has now been pending for more than two and a half years since 6 June 2019.)  DPWD had challenged the jurisdiction of the first instance court of Djibouti on the basis that the dispute must be referred to arbitration pursuant to the arbitration clauses in the Joint Venture Agreement of 22 May 2007 (**JVA**)[18] and DCT's Articles of Association.[19]  Meanwhile, the proceedings on the merits of the petition have continued (a stay was refused), and a decision was rendered by the first instance court substantially in favour of the Republic.[20]  An appeal against that decision is also pending.

---

[11]  SoC, §25(a), §§82-85; WS (Al Banna), §§46-47.

[12]  SoC, §25(b), §§86-93; WS (Al Banna), §48.

[13]  SoC, §§87-88; WS (Al Banna), §§49-50.

[14]  Second Partial Final Award, §§135, 137, 138, 139, 149, 150, 151, 152.

[15]  C-148, Appeal filed by DPWD in the Supreme Court of Djibouti, 6 June 2019.

[16]  C-147, Decision on Jurisdictional Objection of Court of Appeal in the Articles Proceedings, 22 May 2019.

[17]  C-104, Decision on Jurisdictional Objection of Court of First Instance in the Articles Proceedings, 29 January 2019.

[18]  C-3, Joint Venture Agreement between Port Autonome Internationale de Djibouti and DP World Djibouti FZCO, dated 22 May 2007.

[19]  C-4, Doraleh Container Terminal Articles of Association, dated 22 May 2007.

[20]  C-156, Decision of First Instance Court in the Articles Proceedings, 31 December 2019.

56. In relation to the appointment of an interim administrator, the challenge by DCT's Board has now been dismissed at all levels of the Djibouti court system.[21]   A challenge by DPWD against the appointment remains pending.[22]

57. The Tribunal requested a clarification in respect of the temporal aspect of DPWD's claim for lost dividends in its letter of 4 December 2021, insofar as the Claimants' original Statement of Case only referred to dividends owed to DPWD in 2017 or 2017-2018.  The Claimants responded that the claim extends to dividends for 2017, 2018, 2019 and 2020 and referred to the following documents:

    57.1. The request for relief in the Statement of Case reads: "*DECLARE that the Respondent has breached its obligations towards the Second Claimant under each and any of Articles 3.7, 10.2, 12.1.3(vi) or 12.1.3(vii) of the Concession Agreement*".[23]  The Tribunal accepts that this open-ended request allows the Tribunal to rule upon the Republic's liability for breaches of Article 3.7 and/or Article 12.1.3(vi) in relation to lost dividends over any period.  Given that the Statement of Case was filed on 25 February 2019, the Claimants could only have referred expressly in their written submissions to lost dividends for the years 2017 and 2018.  But the request for relief in respect of liability for this claim is not restricted in a temporal sense.

    57.2. In relation to the quantum of any claim for lost dividends, the Claimants have expressly referred to lost dividends for 2017, 2018, 2019 and 2020.  The request is set out above in Section E, paragraph (b)(ii) of which reads: "*lost dividends between 1 January 2017 to 31 December 2020, in the total nominal amount of US$ 116.8 million*".

58. The Tribunal is thus satisfied that DPWD has advanced a claim for lost dividends based upon Article 3.7 and Articles 12.1.3(vi) and 12.1.3(vii) of the 2006 Concession Agreement that extends to lost dividends for 2017, 2018, 2019 and 2020.  These are the Reserved Claims.  The Claimants' alternative submission[24] is that its damages

---

[21]   C-149, Decision of the Supreme Court of Djibouti on the appeal by DCT's Board, 8 September 2019.

[22]   C-157, DPWD's Summons against the appointment of the Administrator, 3 June 2020.

[23]   Cs SoC, §263(b).

[24]   Cs Submission on the Reserved Claims, §14(c).

claim quantified as the lost dividends for those four years in question can be upheld as a remedy for other breaches of contract for which the Republic has already been adjudged to be liable under the 2006 Concession Agreement.  According to the Claimants, these dividends represent DPWD's "*economic interest in the Concession*" as a Shareholder for the purposes of Article 3.7, which the Tribunal has found has been breached by the Republic insofar as the Republic's enactment of Decrees 85 and 87 have usurped DCT's rights and assets and vested them in SGTD and as the Republic has seized the Terminal and DCT's other assets such as its onshore bank accounts and transferred them to itself or SGTD.[25]  Whilst the Claimants' submission is plausible, it is clear that the Reserved Claims provide a more direct path from liability to damages in respect of DPWD's alleged lost dividends and the Tribunal proposes to rule on the Reserved Claims before considering this alternative submission if it proves necessary to do so.

59.  The reason that the Tribunal stayed its consideration of the Reserved Claims in the Second Partial Final Award was as follows:

> In relation to the fourth measure relating to the interference with DCT's corporate affairs through, *inter alia*, the appointment of an Administrator, such that DPWD has allegedly been deprived of its dividend for 2017-18, these are matters that are regulated by the JVA and DCT's Articles of Association.  In order to rule upon this fourth measure, this Tribunal would have to interpret and apply the specific provisions of the JVA and DCT's Articles of Association dealing with "*reserved matters*" and the payment of dividends.  Whilst it is possible that both the 2006 Concession Agreement and the JVA afford overlapping protections to DPWD as a Shareholder of DCT, the JVA is the more specific and comprehensive text in this respect and the allegations raised by DPWD appear to have been submitted to the Scherer Arbitration for determination. In these circumstances, it is appropriate for this Tribunal to stay its consideration of this fourth measure in the context of Article 3.7 of the 2006 Concession Agreement for the time being.  The Tribunal will hear from the Parties as to whether it is necessary to make a ruling on this matter in a subsequent award with regards to the progress of the Scherer Arbitration.[26]

---

[25]  Second Partial Final Award, §§300-301.

[26]  Second Partial Final Award, §303, §309.

60.     The Tribunal's concern has been to ensure that there is no overlapping relief or inconsistent findings as between the two distinct proceedings. The Scherer Tribunal issued its Final Partial Award on 7 July 2021 and, following a request from the Tribunal, that award is now available to it.[27]

61.     In its Partial Final Award, the Scherer Tribunal found that the JVA remains valid and binding and that PDSA remains a shareholder of DCT because the purported transfer of its shareholding of DCT to the Republic was ineffective in the absence of an executed Deed of Adherence on behalf of the Republic (which would bind the Republic to the terms of the JVA). DPWD also brought a claim against PDSA on the basis that the same actions set out at paragraph 54 above constituted a breach of the JVA and DCT's Articles of Association.[28]  The Scherer Tribunal dismissed this claim for the following reasons:

> 541. The various actions listed by the Claimant are not the Respondent's. First, the Articles Proceedings were initiated by the Republic's Ministry of Finance. Second, it was also the Republic that launched the proceedings that led to the appointment of DCT's Provisional Administrator. Third, with regard to the distribution of DCT's 2017 dividends, the Claimant's witness, Mr Al Banna explains that he believes that "the *Republic* appointed the [Provisional] Administrator in response to [his] notice calling for a Board Meeting the previous day, on 25 September 2018" which was, among other things to approve the distribution of the DCT dividends. What else the *Respondent* would have done to prevent this distribution of the 2017 dividends remains unclear.

> 542. For the reasons set out above, the Tribunal finds that the Claimant has not shown why the Republic's actions should be attributable to the Respondent.  Accordingly, the Tribunal finds that the Claimant has failed to establish the Respondent's alleged breaches.[29]

62.     So, in short, DPWD's claim against PDSA for these actions failed because they were the acts of the Republic and not PDSA and there was no legal basis for attributing the acts of the Republic to PDSA.  The Tribunal can thus be satisfied that: (i) the Scherer Tribunal has made no findings in relation to the factual predicate of this

---

[27]     CLA-115, Final Partial Award of Scherer Tribunal.

[28]     CLA-115, Final Partial Award of Scherer Tribunal, §538.

[29]     CLA-115, Final Partial Award of Scherer Tribunal.

claim as it was dismissed on a legal basis; (ii) that legal basis is irrelevant to the present proceedings because the claim is against the Republic for breach of the 2006 Concession Agreement (and not the JVA and/or the Articles); and (iii) there is no possibility of overlapping relief as DPWD's claim against PDSA for the same actions was dismissed.  The Scherer Tribunal's findings, conversely, point to the conclusion that the present Tribunal is the proper forum for DPWD's claim for lost dividends because the actions said to have led to the deprivation are attributable exclusively to the Republic and not to PDSA.

63.  Turning now to the merits of DPWD's claim for breach of Article 3.7 and Article 12.1.3(vi) of the 2006 Concession Agreement, it is clear that the three measures attributable to the Republic as set out at paragraph 54 above have resulted in the non-payment of dividends to DPWD, which is part of its "*economic interest in the Concession*" as a "*Shareholder*" for the purposes of Article 3.7.  These actions were part of a single course of conduct on the part of the Republic designed to eviscerate DPWD's rights under the 2006 Concession Agreement, such conduct including the Republic's enactment of Decrees 85 and 87, the seizure of the Terminal and the vesting of DCT's assets in SGTD, which the Tribunal has already found constituted a violation of Article 3.7.[30]  The same conduct can properly be characterised as an interference with DPWD's "*[f]reedom to conduct… commercial activities in accordance with the terms of this Agreement*" as a "*Shareholder*" for the purposes of Article 12.1.3(vi), as DPWD's rights as a shareholder extended to controlling and managing DCT and to receiving the payment of dividends from DCT.

64.  As the Tribunal has upheld DPWD's liability claim for lost dividends on the basis of Article 3.7 and Article 12.1.3(vi) of the 2006 Concession Agreement (i.e. the Reserved Claims), there is no need to determine whether the damages claim for loss dividends could be maintained based upon the Republic's other breaches of the 2006 Concession Agreement.  Nor is it necessary to rule upon DPWD's claim under Article 12.1.3(vii) of the 2006 Concession Agreement.

---

[30]   Second Partial Final Award, §§300-301.

## H   THE CLAIMANTS' CASE ON DAMAGES

### H1   Introduction

65.   There has been a significant shift in the Claimants' case on damages.  Prior to the issuance of the Second Partial Final Award, the Claimants had calculated damages based upon the enterprise value of DCT as of 31 December 2018 and the corresponding value of DPWD's 33.34% stake in DCT as well as the value of the management fees received by DPWD for the day-to-day operations and management of the Terminal.[31]  The exchanges between the Claimants' experts and the Tribunal's experts in writing and at the hearing on 1-2 October 2019 focused on four main issues:

65.1.   The expected volume of containers that would be shipped to DCT's Terminal over the remaining duration of the 2006 Concession Agreement;

65.2.   The expected prices that DCT could charge for handling that volume of containers over the remaining duration of the 2006 Concession Agreement;

65.3.   The capital expenditure (CAPEX) required to expand the Terminal in order to handle the increased volumes of containers being shipped to the Terminal;

65.4.   The country risk premium that should be used for the discount rate.[32]

66.   The Claimants' case on damages in its initial form was a remedy in the alternative in the sense that the primary remedy was for an order that the Republic perform its obligations under the 2006 Concession Agreement.  At the hearing on 1-2 October 2019, the Tribunal proposed, and the Claimants accepted, that the Tribunal should first render a partial award on the issues relating to the Republic's liability under the 2006 Concession Agreement and, in the event that liability were to be found, on the Claimants' primary remedy of specific performance.  The assessment of damages would thus be reserved to a later award depending upon the Tribunal's findings on liability and specific performance.

---

[31]   Spiller/Chavich 1st Report, §5.

[32]   See Transcript D1/P89 (Arbitrator/Spiller).

67.  The Tribunal ultimately found in its Second Partial Final Award that the Republic
     had breached a number of its obligations under the 2006 Concession Agreement
     and that the Claimants were entitled to an order of specific performance.   The
     deadline for the Republic to comply with that order was two months from the date
     of the issuance of the Second Partial Final Award, but that deadline was subsequently
     extended upon applications by the Claimants that were not contested by the
     Republic.   The Tribunal's disposition in the Second Partial Final Award further
     provided that:

> If the Respondent has not, by any means of its choosing, restored
> to the Claimants all their rights and benefits under the 2006
> Concession Agreement upon the expiry of two months from the
> date of this issuance of this Second Partial Final Award, the
> Tribunal will proceed to assess the compensation (if any) owed by
> the Respondent to the Claimants as a result of the Respondent's
> breaches of the 2006 Concession Agreement (the deadline may be
> extended at the discretion of the Tribunal)[.][33]

68.  On 19 February 2021, the Claimants wrote to the Tribunal in respect of the
     Republic's non-compliance with the order to perform its obligations under the 2006
     Concession Agreement.   The Claimants informed the Tribunal that they elected to
     affirm the 2006 Concession Agreement and seek damages for accumulated losses
     for the Republic's breaches of that agreement:

> Since 22 February 2018, the Claimants have affirmed the 2006
> Concession Agreement and pressed the Republic (as the party in
> breach) to perform it obligations. Indeed, the Claimants' efforts
> culminated in the Tribunal's Second Partial Final Award, which
> granted the Claimants' requested relief of specific performance
> against the Republic.
>
> The Claimants continue to affirm the 2006 Concession
> Agreement and confirm their election to treat it as ongoing,
> notwithstanding the Republic is in continuing repudiatory breach
> of it.
>
> The Claimants are entitled under English law to seek damages for
> accumulated losses caused by the Republic's breaches and
> failure/delay in performance of its obligations under the 2006
> Concession Agreement. The Claimants intend to claim damages
> in respect of these accumulated losses over the period since 22

---

[33]  Second Partial Final Award, §363.1.

February 2018, and respectfully request the Tribunal's leave to amend and update their claims to that effect.

69. The Tribunal is satisfied that the Claimants have never elected to terminate the 2006 Concession Agreement on the basis of an alleged repudiatory breach by the Respondent.  No such election has been made during the course of these arbitration proceedings.  The Tribunal inquired as to whether any other correspondence had passed between the Claimants and the Respondent on this issue and the Claimants produced two documents.  The first is a letter from the Claimants' lawyers to the President of Djibouti dated 23 January 2020.  This letter sought confirmation of the Republic's compliance with the Tribunal's Second Partial Final Award.  The letter set out the terms of the Tribunal's order of specific performance and then "*invite[d] the Government to indicate the date on which the Republic will restore their rights under the Concession Agreement. This will ensure that their personnel may be well prepared to travel to Djibouti and to resume their positions as Operator and Manager of the Terminal in an efficient and effective manner, without disrupting the Terminal's business and service to its customers.*"[34] This statement is obviously consistent with the continuing affirmation of the 2006 Concession Agreement.

70. The second document was an extract of the transcript from a hearing in the Scherer Arbitration (*DP World Djibouti FZCO v Port de Djibouti SA*) on 13 January 2021. PDSA is participating in those proceedings and its principal is Mr Aboubaker Omar Hadi, who is also the Republic's representative in these proceedings (being the Chairman of the Djibouti Ports and Free Zones Authority).  That transcript contains the following statement from DPWD's counsel:

> If you look at the Douglas second award, you'll see that regrettably it's been mischaracterised to you. The claimants have not at this juncture accepted Djibouti's repudiatory breach, to the contrary, they have affirmed the concession, and the claimants have not sought damages at this juncture in the Douglas arbitration. The concession remains on foot.[35]

---

[34] C-156, Letter from Quinn Emanuel to the President of Djibouti, 23 January 2020.

[35] C-157, Scherer Arbitration Transcript (13 January 2021), p. 33.

71.   The Tribunal is thus satisfied that the Claimants' position in this arbitration concerning the affirmation of the 2006 Concession Agreement has been consistent in other fora.

72.   The Claimants' case on damages as it was pleaded prior to the hearing on 1-2 October 2019 was premised upon two alternative hypothetical scenarios in the future: (i) in the event that the Republic were to comply with the order for specific performance, then the Claimants would claim damages for accumulated losses from 22 February 2018 until the date on which the Republic recommenced its performance of the obligations under the 2006 Concession Agreement; (ii) in the event that the Republic were to fail to comply with the order of specific performance, then at that point the Claimants would terminate the 2006 Concession Agreement for repudiatory breach and claim damages on that basis.

73.   Instead of electing to terminate the 2006 Concession Agreement once the extended period for the Republic's compliance with the Tribunal's order for specific performance had expired, the Claimants affirmed the 2006 Concession Agreement and claimed damages for accumulated losses caused by the Republic's breaches of that agreement over a three-year period between 22 February 2018 (when the Republic purported by Decree to transfer the Doraleh Terminal from DCT to a new State-owned company) until 31 March 2021, while reserving the right to claim for further accumulated losses for future periods (which they did in relation to Management Fees and Dividends said to have been earned up to the date of this Third Partial Final Award).   As was anticipated in the Claimants' letter of 19 February 2021, this revised case on damages was set out in the Claimants' Supplementary Statement of Case, filed on 9 April 2021, together with a Third Expert Report of Prof. Spiller and Ms Chavitch.

74.   By affirming the 2006 Concession Agreement on 19 February 2021 after the period for the Republic to comply with the Tribunal's order for specific performance had expired, the Claimants thereby abandoned their right to treat the 2006 Concession Agreement as discharged on the basis of the Republic's alleged repudiatory breach under English law as the law applicable to the contract.   The affirmation of the contract preserves, however, their right to seek damages for the Republic's breaches of the 2006 Concession Agreement.   In the words of the editors of *Chitty on Contracts*:

> …the innocent party is not ordinarily bound to treat himself as discharged: if the contract is still executory, he may elect instead to treat it as continuing. He may also waive his right of discharge, accept the defective performance of the other party, and content himself with damages, which are his remedy in any event.[36]

## H2 Overview of the Claimants' claim for accumulated losses between 22 February 2018 until 31 March 2021

75. The basic compensatory principle in English law for loss caused by breach of contract is to put the innocent party in the same situation as if the contract had been performed.[37]

76. The Claimants submit that if the Republic had continued to perform its obligations under the 2006 Concession Agreement between 22 February 2018 and 31 March 2021, the following would have been the position:

> (a) it would be business-as-usual for DCT at the Terminal, enjoying its Concession and operating the Terminal between 22 February 2018 and until 31 March 2021, generating substantial profits for itself, which instead is now being enjoyed by SGTD/the Republic; and

> (b) DPWD would continue to own, control and derive benefit from its investment and economic interest in the 2006 Concession Agreement and DCT's assets, in particular the Terminal, receiving: (i) its management fee, calculated the higher of US$ 2.4 million per annum or 5 percent of the gross revenue of the Terminal; and (ii) returns from its shareholding in DCT in the form of dividend, on which the usual and consistent practice of the Parties has been to declare 80 percent of DCT's annual profit as distributable dividend. In other words, DPWD receives 26.672 percent of DCT's annual profit (being 33.34 percent of the 80 percent marked for distribution) as its share of dividend.[38]

77. (The Claimants clarified at the hearing that the legal entitlement for management fees and dividends earned by DPWD for 2020 arose prior to 31 March 2021 but, if the Tribunal were concerned about when in fact they would have been paid in the

---

[36] CLA-114, *Chitty on Contracts*, 33rd ed. 2020, §§24-001.

[37] *Robinson v Harman* (1848) 154 ER 363.

[38] Cs Supplementary SoC, §31.

counterfactual scenario, then they would have been paid by the time the Tribunal issues its Third Partial Final Award.)[39]

78.    The Claimants have not, however, sought to claim damages on the basis that they would have operated the Terminal more profitably than the Republic/SGTD over the relevant period "*to avoid speculation and debate*";[40] rather they have computed their losses based on the performance of the terminal under the control over the Republic/SGTD and to this end they have relied upon the actual container traffic statistics published by SGTD.[41]

79.    The Tribunal accepts the Claimants' abstract premises of their approach to the quantification of damages, which are fully consistent with the compensatory principle under English law.  If the Republic had continued to perform its obligations under the 2006 Concession Agreement between 22 February 2018 and 31 March 2021, then by definition it would have been "*business-as-usual for DCT*" as the operator of the terminal and DPWD would have continued to earn fees in accordance with the Management Contract in place as well as receiving dividends from DCT in accordance with the applicable rules and corporate practice.

80.    The devil, however, is always in the detail in any quantification exercise, and the assessment of the various heads of loss claimed by the Claimants in following this general approach has been the subject of a rigorous debate between the Claimants' quantum experts, Prof. Spiller and Ms Chavich, and the Tribunal's quantum experts, Mr Senogles and Mr Cross.  The Tribunal has throughout this arbitration proceeded on the basis that it has a heightened responsibility to test the evidence, expert opinions and legal submissions offered by the Claimants in circumstances where the Respondent is not participating.  In this respect, the debate between the Claimants' and the Tribunal's experts has been invaluable and the Tribunal wishes to record its appreciation to them.  The positions of the experts were some distance apart at the start of the exercise but narrowed considerably by the time of this Third Partial Final

---

[39]    Transcript, 29 June 2021, pp. 28-9 (Sinclair).

[40]    Cs Supplementary SoC, §33.

[41]    Cs Supplementary SoC, §34.

Award as a result of refinements encouraged by constructive criticism in both directions.

81.  The Tribunal will now address each head of loss as set out in the Claimants' request for relief by first setting out the positions of the experts and then making its own assessment and conclusions.  As all the claims are contingent on the calculation of DCT's free cash flows over the relevant period, however, the Tribunal will first analyze the experts' evidence on this calculation.

**H3   Calculation of DCT's free cash flows between 1 January 2018 and 31 December 2020**

82.  As stated previously, the Claimants have eschewed any argument that the Terminal would have been run more profitably over the relevant period had DCT and DPWD remained in control.[42]  Instead, the calculation is based on the actual container traffic statistics published by the actual operator, SGTD, until the end of 2020.[43]  SGTD does not, however, publish its annual financial statements (whether audited or otherwise) and there is otherwise no official financial information that has been placed on the record in respect of the revenue from the Terminal.[44] The Claimants' experts, therefore, had to estimate the profits that would have been earned in respect of the actual container volumes that were moved through the Terminal over the relevant time. This calculation is described by the Claimants as including the following elements:

> (i) average revenue per TEU based on DCT's 2017 average revenue per TEU, adjusted by US inflation thereafter, which is reasonable as no downward pressure on tariffs at the Terminal was expected in the near-term given the Terminal's significant competitive advantage; (ii) operating costs and working capital requirements based on DCT's 2017 financial statements, adjusted to account for the volume of containers handled and for inflation; and (iii) sustaining capital expenditures including an additional US$ 80 million budgeted for 2018. Furthermore, as DCT was unable to pay the declared dividend of 2017 to its shareholders, Compass Lexecon continue to account for those sums as cash

---

42   Cs Supplementary SoC, §33.

43   Third Expert Report Spiller/Chavich, §9.

44   C-155, Africa Times 'Djibouti increases reliance on Beijing, but at what cost?', 31 March 2021.

retained by the business (consistent with the approach taken in their previous reports).[45]

83.    This calculation was undertaken by the Claimants' experts in their Third Expert Report.[46]

84.    The Tribunal's experts agreed with the use of the actual figures for the container volumes that moved through the Terminal over the relevant period.  They disagreed, however, with the Claimants' experts' assumption[47] that SGTD was able to increase its prices after 2017 in line with US-based inflation.[48]  Instead, the Tribunal's experts compared DCT's Tariff Book in 2017 with SGTD's Tariff Book in 2021 and concluded that "*they looked remarkably similar, if not identical*".[49]  Moreover, by the end of 2020, SGTD's volumes declined to 93.9% of 2017 volumes.  This was significant because, "*[i]n container terminal businesses, typically there is a correlation between trends in volumes and pricing*".[50]  The Tribunal's experts instead opined that it would be reasonable to assume that there was no inflation in prices over the relevant period,[51] and this was further confirmed by the fact that in DP World's Middle East, Europe and Africa Division, volumes and pricing had been relatively flat as well from 2017 to 2020.[52]  The Tribunal's experts' more conservative position on pricing was ultimately accepted by the Claimants' experts.[53]

85.    The Tribunal's experts agreed with the Claimants' experts' assessment of operating costs (fuel, electricity and water, transportation and other costs of sales) based on the volume of containers handled.[54]  Fixed and administrative costs were calculated

---

[45]    Cs Supplementary SoC, §34.

[46]    Third Expert Report Spiller/Chavich, §§14-23.

[47]    Third Expert Report Spiller/Chavich, §11.

[48]    Second Expert Report Cross/Senogles, §3.2.3.

[49]    Second Expert Report Cross/Senogles, §3.2.5.

[50]    Second Expert Report Cross/Senogles, §3.2.12.

[51]    Second Expert Report Cross/Senogles, §3.2.4.

[52]    Second Expert Report Cross/Senogles, §3.2.9.

[53]    Fourth Expert Report Spiller/Chavich, CLEX-50, tab "FCF", row 17.

[54]    Third Expert Report Spiller/Chavich, §14.  Agreed: Second Expert Report Cross/Senogles, §3.3.1.

on the basis of the 2017 levels and then adjusted for Djibouti inflation thereafter.[55] There was also agreement in relation to the assumptions relating to Capex and changes in working capital: there was no evidence of capital expenditures related to any expansion works over the period but an additional USD 80 million was included for a railway project, additional equipment replacement and other capital expenditure based on the budget for 2018.[56]

86. Both the Claimants' experts and the Tribunal's experts ultimately agreed on the following figures for DCT's free cash flows (in USD millions) between 1 January 2018 and 31 December 2020 as expressed in the Claimants' experts' model (CLEX-50). This is the relevant period for calculating the management fees and dividends to which DPWD would have been legally entitled up to 31 March 2021 or which would have been paid to DPWD in fact up to the date of this Third Partial Final Award.

| 2018 | 2019 | 2020 |
|------|------|------|
| 110.2 (including onshore cash balance of 63.0 at the end of 2017) | 123.5 | 124.5 |

87. The Tribunal has tested and confirmed the reasonableness of the assumptions included in this model as refined by the constructive criticism offered by the Tribunal's experts as reflected in the foregoing discussion. The Tribunal accepts these baseline figures as the best estimate of DCT's free cash flows over the relevant period. On the basis of these figures the individual claims can now be assessed.

**H4    DPWD's damages claim for loss of management fees**

88. DPWD's damages claim for the loss of management fees is formulated as follows:

(i) [Order to compensate DPW] for its lost management fees between 23 February 2018 to 31 December 2020, in the total nominal amount of US$ 31.4 million, together with pre-Award compound interest at the rate of 12.2 percent, in the amount of

---

[55]   Third Expert Report Spiller/Chavich, §14.  Agreed: Second Expert Report Cross/Senogles, §3.3.1.

[56]   Third Expert Report Spiller/Chavich, §17.

US$ 0.9 million as at 31 March 2021, or at such other rate as the Tribunal sees fit[.][57]

89.   In the Second Partial Final Award, the Tribunal concluded that DPWD was entitled to advance claims in respect of the benefits conferred upon the "*Manager*" pursuant to Article 12.1.3(vi) of the 2006 Concession Agreement by virtue of the Contracts (Rights of Third Parties) Act 1999.[58]   Article 12.1.3(vi) reads:

> Without prejudice to the generality of the provisions of Article 12.1.1 above, the Grantor agrees that the Concessionaire, its Shareholders, Contractors, sub-concessionaires, Manager, sub-contractors, their agents and expatriate personnel shall at a minimum be entitled to the following exemptions and benefits throughout the Concession Period:
>
> […]
>
> (vi) Freedom to conduct all industrial and commercial activities in accordance with the terms of this Agreement;

90.   The Tribunal found that DPWD had been deprived of its right to conduct "*commercial activities*" as the appointed Manager of the Terminal as a result of the Republic's Decree 85.[59]   The scope and terms of those activities are memorialized in the Management Services Agreement between DCT and DPWD dated 6 December 2007 (**Management Services Agreement**).

91.   The remuneration that DPWD was to be paid for conducting these commercial activities in the form of management services is set out in clause 23 of the Management Services Agreement:[60]

> (a) The annual Management Fee due to the Manager under this Agreement shall be the higher of:
>
> (i) US$ 2,400,000 (the Base Amount); and
>
> (ii) 5% of the Gross Revenues.
>
> (b) Within 7 days of the end of each month, the Manager shall submit to the Owner a statement setting out the Management Fee

---

[57]   Cs Letter to the Tribunal of 9 July 2021, Annex.

[58]   Second Partial Final Award, §200.

[59]   Second Partial Final Award, §§310-312.

[60]   C-6. Cs Supplementary SoC, §31.

payable to it for the preceding month. The Parties agree that, for the purposes of determining the amount set out in Clause 23(a)(ii), the Gross Revenues shall be determined on a year to date basis as per accounts in accordance with International Accounting Standards.

(c) Within 28 days of the end of Operating Year 1 and each subsequent Operating Year, the Manager shall determine the actual Gross Revenues for Operating Year 1 or the previous Operating Year (as relevant) and determine the amount set out in Clause 23(a)(ii) for Operating Year 1 or the previous Operating Year (as relevant). In the event that the amount determined in accordance with this Clause 23(c) is greater than the Base Amount (as adjusted in accordance with Clause 24 the Manager shall submit to the Owner a statement setting out the additional amount owed to the Manager for the Management Fee along with all reasonable supporting information requested by the Owner.

(d) The Owner shall pay the Manager any amounts claimed by the Manager under this Clause 23 within 14 days of its receipt of a statement from the Manager.

92. There was ultimately full agreement between the Claimants' experts and the Tribunal's experts in relation to the quantification of the nominal amount for this head of loss as the terms of the legal entitlement are clear and the experts agreed on the calculation of DCT's gross revenues.[61]

93. There was one disagreement in an earlier stage relating to the likely timing of the payment of the management fees and dividends to DPWD in 2020 based upon the prior history of recorded payments.[62] This issue would have had the effect of excluding management fees and dividends earned or accrued during the year 2020 in so far as they were unlikely to have been declared and paid by DCT to DPWD prior to 31 March 2021. The Tribunal's experts ultimately accepted that this issue had become redundant since at the likely date of this Third Partial Final Award, in the normal course of business the management fees and dividends accrued during 2020 were likely to have been declared and also to have been paid to DPWD.[63]

---

[61] Cross-Senogles Observations Note, §3.1.2; Fifth Expert Report Spiller/Chavich, §4.

[62] Second Cross-Senogles Report, §2.1.3 e), f).

[63] Cross-Senogles Observations Note, §3.1.1.

94. The other issue related to a correction that was made on the basis of DCT's 2018 Offshore Account Statement (CLEX-51): it transpired that USD 1.5 million had been paid out of the funds on that account to DPWD for the 1 January – 23 February 2018 management fees.  The equivalent amount was, therefore, deducted from the nominal compensation owing to DPWD.[64]

95. The Tribunal is satisfied that DPWD would have been entitled to management fees of the amount of USD 31,390,693 (the precise sum reflected in CLEX-50) pursuant to clause 23 of the Management Services Agreement over the period 23 February 2018 to 31 December 2020 and that such loss followed directly from the Respondent's breach of Article 12.1.3(vi) of the 2006 Concession Agreement.  The claim for interest will be addressed globally in respect of all claims below.

**H5    DPWD's damages claim for loss of dividends from DCT**

96. The Tribunal has ruled upon the Republic's liability in relation to DPWD's claim for loss of dividends from DCT at Section G above.

97. DPWD's damages claim for loss of dividends from DCT is quantified as follows:

> (ii) for its lost dividends between 1 January 2017 to 31 December 2020, in the total nominal amount of US$ 116.8 million, together with pre-Award compound interest at the rate of 12.2 percent, in the amount of US$ 21.0 million as at 31 March 2021, or at such other rate as the Tribunal sees fit[.][65]

98. The Claimants relied upon the following evidence of DCT's practice in relation to dividends to its shareholders.

99. First, Mr Al Banna provided the following testimony:

> [U]ntil the onset of the present dispute between the Republic and DCT and DP World, DCT has distributed around 80 percent of net profits each year as dividends, as a matter of policy. The remaining profit has been retained in reserve as capital to facilitate expansion. DPWD, which has a determinative vote over DCT's dividend policy as a Reserved Matter, could have voted to increase its annual returns from the Terminal. However, it did not do so

---

64    Fourth Expert Report Spiller/Chavich, §4; Cross-Senogles Observations Note, §3.1.1.

65    Cs Letter to the Tribunal of 9 July 2021, Annex.

keeping in mind the parties' long term commitments under the Concession Agreement.[66]

100.  With reference to a series of DCT Board Resolutions, he also provided the actual figures for the historic dividends paid to the two shareholders of DCT:[67]

| Year | Dividend to PDSA | Dividend to DPWD |
|------|------------------|------------------|
| 2009 | USD 22,164,450 | USD 11,085,550 |
| 2010 | USD 25,922,178 | USD 12,964,978 |
| 2011 | USD 25,325,440 | USD 12,666,519 |
| 2012 | USD 38,487,503 | USD 19,249,525 |
| 2013 | USD 35,838,482 | USD 17,924,617 |
| 2014 | USD 40,896,469 | USD 20,454,370 |
| 2015 | USD 52,284,809 | USD 26,150,248 |
| 2016 | USD 69,355,589 | USD 34,688,199 |
| 2017 (declared, but not yet paid) | USD 69,464,674 | USD 34,742,758 |
| **TOTAL** | **USD 379,739,594** | **USD 189,926,764** |

101.  Second, those DCT Board Resolutions (or Resolutions of Shareholders' Meetings) show consistently that 80% of the annual profits of DCT were distributed as dividends to the two shareholders in proportion to their shareholdings (i.e. 66.66% to PDSA and 33.34% to DPWD).[68]

102.  There was no dispute between the Claimants' experts and the Tribunal's experts in relation to the quantum of this claim, as it was a matter of simple arithmetic once the free cash flows of DCT over the relevant period had been calculated.  As was previously discussed in relation to the claim for management fees, the difference between the experts relating to the timing of the payment of the dividends has become redundant in so far as all experts accept that DPWD's dividends for 2020 would have been paid by the time this Third Partial Final Award is rendered.

103.  The Tribunal concludes that DPWD would have been entitled to dividends in the amount of USD 116,772,715 (the precise sum reflected in CLEX-50) for the period 23 February 2018 to 31 December 2020 and that such loss followed directly from the Respondent's breach of Articles 3.7 and 12.1.3(vi) of the 2006 Concession

---

[66]  First Witness Statement of Mr Al Banna, §19.

[67]  First Witness Statement of Mr Al Banna, §18.

[68]  Exhibits C-73, C-74, C-75, C-76, C-77, C-78, C-79, C-80, C-81.

Agreement.  The claim for interest will be addressed globally in respect of all claims below.

## H6   DCT's damages claim for losses resulting from the seizure of its onshore bank account

104.   DCT's claim is formulated as follows:

> (i) for the losses resulting from the seizure of the First Claimant's onshore bank account at Banque pour le Commerce et l'Industrie - Mer Rouge (BCIMR), Djibouti, by the Respondent, on or around 22 February 2018, in the total amount of US$ 35.1 million (representing DCT's cash balance in the counterfactual as of 31 March 2021 net of costs and dividend payments)[.][69]

105.   The Tribunal, in its Second Partial Final Award, found that the Respondent breached, *inter alia*, Article 12.1.3(vii) of the 2006 Concession Agreement, which reads:

> Without prejudice to the generality of the provisions of Article 12.1.1 above, the Grantor agrees that the Concessionaire, its Shareholders, Contractors, sub-concessionaires, Manager, sub-contractors, their agents and expatriate personnel shall at a minimum be entitled to the following exemptions and benefits throughout the Concession Period: […]
>
> (vii) Exemption from nationalization or any restrictive measures with respect to ownership of private property and the guarantee of private ownership of the Concessionaire's assets[.]

106.   The Tribunal's specific finding was as follows:

> DCT was further deprived of the "*exemptions and benefits*" in Articles 12.1.3(vii) relating to DCT's property and assets in so far as Article 4 of Decree 85 as well as Article 4 of Decree 87 transfers all of DCT's assets to SGDT.  Article 4 of Decree 85 also requisitions "*all the property, goods, materials, or non-material property and personnel that is essential for the proper functioning of the container terminal at Doraleh*" for the State.[70]

107.   There is no doubt, in view of the Tribunal's previous findings of liability, that there is a contractual basis to claim for losses relating to the seizure of DCT's onshore account.  The question instead is whether it is open to the Claimants to claim for

---

[69]   Cs Letter to the Tribunal of 9 July 2021, Annex.

[70]   Second Partial Final Award, §§257-263.

accumulated losses for a particular period based on a valuation of DCT's lost cash flows over that period and at the same time claim losses on the basis that DCT has been permanently deprived of a particular asset. This question was put by the Tribunal to the Claimants' experts during the hearing on 29 June 2021.[71]

108. The Claimants have sought to reconcile these positions by calculating the cash that would have been left on DCT's onshore bank account <u>at the end of the relevant period</u> given that at least some of the cash at the start of the period (i.e. at the point when the account was seized) would have been deployed to operate the Terminal and contribute, *inter alia*, towards the payment of DPWD's management fees and dividends to the shareholders. This was graphically illustrated in Figure 1 of the Fifth Expert Report of Prof. Spiller and Ms Chavich:



Source: Compass Lexecon Updated Deprivation Valuation Model (CLEX-50).

Note: Free Cash Flows = Revenues − Cost of Sales − General & Administrative Costs − Royalties − Management Fees − Capital Expenditures − Change in Working Capital. 2018 free cash flows increased from USD 45.7 million to USD 47.2 million reflecting the USD 1.5 million in management fees that was paid from DCT's offshore account (instead of being paid from DCT's operations). For presentational purposes we do not show in the above Figure

---

[71]   Transcript, 29 June 2021, pp. 47-50.

the USD 47.7 million DCT held in its offshore account as of the start of 2018,
as we do not include such amounts in our assessment of damages.

109.  It should be noted, because it had caused some confusion among the experts at an earlier stage, that no claim is made in relation to DCT's offshore cash balance and such cash balance is not taken into account in the assessment of damages.[72] The Tribunal's understanding is that DCT still maintains control over that offshore account in London and that the cash balance has not been used to pay for lost dividends or management fees, save for the USD 1.5 million used to pay the 1 January – 23 February 2018 management fees, which has been deducted from DPWD's relevant claim.[73] Moreover, the cash balance is in substantial part subject to a freezing injunction secured by a third-party creditor of the Respondent since August 2017.[74]

110.  The position of the Tribunal's experts is that DCT's lost onshore cash balance cannot be claimed in the context of a claim for losses during a finite period.[75] The Claimants' experts, in their final report, described the persisting disagreement in the following terms:

> Whether the onshore cash balance can be claimed depends on the correctness of the assumption that Cross-Senogles appear to make that Djibouti will return the cash balances to DCT with the Terminal at some point in the future, which we understand is a matter for legal submissions. As we explained in our Fourth Report, though, we understand that the onshore account was seized by Djibouti along with the Terminal on February 22, 2018, and that there is no evidence on the record to support the view that Djibouti would return such cash balances to DCT even if it were to return the Terminal. Given this, such lost cash balances comprise economic losses to DCT.[76]

---

[72]  Fifth Expert Report Spiller/Chavich, §19.

[73]  Fifth Expert Report Spiller/Chavich, §§19, 21.

[74]  C-61, *Soprim Construction SARL v Republic of Djibouti*, Worldwide Freezing Injunction, 4 September 2017.

[75]  Cross-Senogles Observations Note, §3.1.1.

[76]  Fifth Expert Report Spiller/Chavich, §17.

111.  The Claimants' experts further add in a footnote that: "*The fact that damages took place during a so-called 'finite period' in the past, does not mean that, during this past finite period, Claimants may not have lost cash holdings in a bank account.*"[77]

112.  The Tribunal accepts the Claimants' experts' position on this point.  It is true, as Professor Spiller testified, that the cash accumulated by DCT even after the payment of dividends (80% of DCT's annual profits) was well in excess of its required working capital.  The cash balances were high before the Republic took over the Terminal and this would have allowed DCT to invest in the planned expansion of the Terminal as had been envisaged.  The Tribunal agrees that, at the end of the period for calculating the Claimants' accumulated losses, excess cash would have been accumulated by DCT and this excess cash would not have been exhausted by the payments of dividends to the shareholders.  The quantum of that excess cash as of 31 March 2021 represents the loss caused by the seizure of DCT's onshore account on 23 February 2018.

113.  In respect of the actual calculation of the amount that would have remained on DCT's onshore account as of 31 March 2021, the Tribunal's experts did not take issue with the calculation (as opposed to the principle of whether or not it could be part of the claim at all).  The Tribunal concludes that DCT's claim for the losses resulting from the seizure its onshore bank account at Banque pour le Commerce et l'Industrie - Mer Rouge (BCIMR), Djibouti, by the Respondent should be upheld in the amount of USD 35,123,370 (the precise amount reflected in CLEX-50).  Interest will be dealt with below.

**H7   DCT's damages claim for lost cash flows representing the lost dividends due to PDSA**

114.  This claim is formulated as follows:

> (ii) for the lost cash flows representing the lost dividends due to Port de Djibouti S.A. (PDSA), between 1 January 2017 to 31 December 2020, in the total nominal amount of US$ 233.5 million, such sum when received to be earmarked by the Board of [DCT] for the purpose of the payment of such dividends[.][78]

---

77   Fifth Expert Report Spiller/Chavich, FN 24.

78   Cs Letter to the Tribunal of 9 July 2021, Annex.

115.   This claim is in essence the mirror image of DPWD's claim for dividends over the same period.   It will be recalled that DWPD's claim is a claim being brought in DPWD's own right as a named third-party beneficiary to the 2006 Concession Agreement—as a "Shareholder".   It is a claim that is premised upon the Republic's breach of Articles 3.7 and/or 12.1.3(vi) of the 2006 Concession Agreement.

116.   It is at this point that some cracks in the mirror become visible.   PDSA, as the other Shareholder of DCT, has made no claim in this arbitration against the Republic for dividends that normally would have accrued to it.   If PDSA were to make such a claim against the Republic, then the Republic may well seek to defend that claim by observing that, after it had taken over the Terminal, it nationalised PDSA's shares in DCT by virtue of a Presidential Ordinance of 9 September 2018,[79] and then, by way of compensation, transferred the State's shares in SGTD (the current operator of the Terminal) to PDSA on 28 October 2019.[80]   The Tribunal has been put on notice of these developments and they were expressly referred to in the Second Partial Final Award.

117.   DCT is saying, in effect, that these considerations are beside the point because it is bringing the claim in its own name.[81]   But at the same time, the Claimants recognise that the ultimate beneficiary of any damages recovered by this claim would be PDSA and not DCT.   This recognition manifested itself in the form of the Claimants' proposed undertaking that would accompany any award of damages to DCT under this head of claim:

> DPWD formally recognises and undertakes before the Tribunal that to the extent that the Tribunal awards DCT damages for its lost cash flow over the Relevant Period, DPWD would have no claim to dividends in respect of that part of the award equivalent to the dividends due to PDSA if it has itself been awarded and recovered damages in respect of its own lost management fees and dividends. Any residual sums that thereafter remain with DCT after DPWD is compensated will remain DCT's property, with part of that amount being specifically earmarked to pay

---

[79]   Second Partial Final Award, §132.

[80]   Second Partial Final Award, §142.

[81]   Transcript, 29 June 2021, p. 18 (Sinclair).

PDSA its lost dividends. DPWD will not utilise its control over
DCT to appropriate those latter sums of money.[82]

118.  This approach is problematic for several reasons.

119.  <u>First</u>, the calculation of cash flows that would have passed through DCT had the
Republic performed its obligations under the 2006 Concession Agreement is not the
same thing as calculating DCT's losses stemming from the Republic's breaches.  The
calculation of DCT's cash flows is a necessary step in the assessment of damages for
actual losses in this case because the quantification of DPWD's entitlement to
management fees and dividends depends on the counterfactual of what those cash
flows would have been (i.e. in order to determine what the revenues and profits of
DCT would have been over the relevant period).  The same thing must be said in
relation to DCT's claim for loss resulting from the seizure of its onshore bank
account balance: that also depends upon a calculation of DCT's cash flows on the
counterfactual basis to see what the resulting onshore cash balance would have been
following the normal course of operations during the relevant period.

120.  The calculation of lost cash flows can, of course, be used to put a value on an
enterprise in a typical discounted cash flow valuation.  But that is not the premise of
the Claimants' approach to damages here: the Claimants are not claiming damages
on the basis of the permanent deprivation of their rights under the 2006 Concession
Agreement (which might invite a comparison of DCT's enterprise value before and
after that deprivation and thus, *inter alia*, reliance on a calculation of expected cash
flows); instead, the Claimants have affirmed that their rights under the 2006
Concession Agreement remain in full force and effect and are claiming damages that
they have suffered as a result of the breach of those rights over a particular period.

121.  If DCT were to receive a sum of money "*for the lost cash flows representing the lost dividends
due to Port de Djibouti S.A. (PDSA)*"—using the words of the request for relief—then
the beneficial owner of those funds would be PDSA and not DCT.  This is
confirmed in substance in the next sentence of the request: "*such sum when received to
be earmarked by the Board of [DCT] for the purpose of the payment of such dividends*".  That

---

[82]  Cs Letter of 12 November 2021, §16.

language comes very close to recognizing that DCT would essentially be holding those funds on trust for PDSA.

122. To conclude this point: the calculation of DCT's lost cash flows is a proxy for the assessment of actual losses suffered by DPWD and DCT as a result of the Republic's breaches of the 2006 Concession Agreement. The Tribunal cannot award DCT a sum of money "*representing the loss dividends due to [PDSA]*" because PDSA has not made a claim in this arbitration and it is plainly obvious that such a claim would face significant hurdles were it to be made. DCT cannot claim this sum in its own right as a mere conduit for sums that might have been paid to PDSA by way of dividends had the Republic performed its obligations under the 2006 Concession Agreement.

123. <u>Second</u>, any order to the effect that money should be paid to DCT and then be "*earmarked*" for PDSA would be fraught with practical difficulties:

123.1. There is currently a battle waging to exercise control over DCT. An administrator over DCT has been appointed in Djibouti and that administrator is asserting control over DCT in relation to certain matters. This is all the subject of ongoing litigation in Djibouti.[83]

123.2. This Tribunal may not be in a position to supervise the execution of the Claimants' proposed undertaking in relation to money received by DCT and "*earmarked*" for PDSA, which, as previously stated, may be tantamount to a trust.

123.3. The terms of the Claimants' undertaking in any case may generate further disputes in the future. DPWD appears to reserve the right to make a claim on the funds earmarked for PDSA in the event that it has been awarded damages for lost management fees and dividends but has not fully recovered those damages from the Republic. This would provide DPWD with two potential routes to recover the same award of damages but risk further complications if DCT were found to be holding the funds on trust for PDSA.

---

[83] Transcript, 29 June 2021, p. 18 (Sinclair).

124. For these reasons, DCT's damages claim "*for the lost cash flows representing the lost dividends due to Port de Djibouti S.A. (PDSA), between 1 January 2017 to 31 December 2020*" is dismissed.

**H8   The Claimants' claim for interest**

125. DPWD claims pre-award compound interest at the rate of 12.2% in respect of its lost management fees and dividends as at 31 March 2021:

> (i) for its lost management fees between 23 February 2018 to 31 December 2020, in the total nominal amount of US$ 31.4 million, together with pre-Award compound interest at the rate of 12.2 percent, in the amount of US$ 0.9 million as at 31 March 2021, or at such other rate as the Tribunal sees fit;
>
> (ii) for its lost dividends between 1 January 2017 to 31 December 2020, in the total nominal amount of US$ 116.8 million, together with pre-Award compound interest at the rate of 12.2 percent, in the amount of US$ 21.0 million as at 31 March 2021, or at such other rate as the Tribunal sees fit[.][84]

126. DCT does not claim pre-award interest in relation to the balance of its onshore bank account, which is logical given that such balance is calculated on the basis of the financial costs of DCT's operation of the Terminal, as well as the payment of dividends and management fees to DPWD, over the relevant period up to 31 March 2021.

127. In relation to post-award interest, the Claimants request the following relief:

> (d) ORDER under Section 49 of the Arbitration Act 1996 and Article 26.4 of the LCIA Rules that the Respondent pay the Claimants compound interest on all sums awarded in this Partial Final Award at the rate of 12.2 percent, from the date on which payment is due to the Claimants under the Award until payment, or alternatively, interest at such rates and with such rests as it considers meets the justice of the case.[85]

128. It follows from these requests for relief that the Claimants are claiming post-award interest at the same rate as the pre-award interest.

---

[84]   Cs Letter to the Tribunal of 9 July 2021, Annex.

[85]   Cs Letter to the Tribunal of 9 July 2021, Annex.

129.  The rationale for the interest rate of 12.2 percent, which is calculated to reflect the Claimants' cost of capital, was explained by the Claimants' experts in the following terms:

> DCT and DPW have been temporarily deprived of their economic interests in the Terminal and have forgone or delayed receipt of any cash flows that might have otherwise been received from the Terminal in the interim. In order to make Claimants whole, it is necessary to bring Claimants to a situation in which they would have voluntarily kept their foregone cash flows within the asset. The cost of capital reflects the opportunity cost of this investment (i.e., the return expected when deciding to invest in assets with a similar risk profile) and, thus, represents the expected average return investors would have required to voluntarily invest in the asset. In other words, no investor would willingly postpone collection of their returns for less than the cost of raising equivalent funds, which is reflected, in this case, by the cost of capital of a port terminal operator in Djibouti.[86]

130.  Although the Tribunal appreciates the economic logic of this approach, it does not consider this to be a fair compensatory measure in this case.  Interest rates throughout the world have been extremely low during the relevant period.  If the Claimants had been put in funds at the relevant time then they would not have had the opportunity of investing in a comparable asset in Djibouti (there are none); that cash in all likelihood would have been invested elsewhere.  Moreover, the cost for the Claimants to raise funds in the international markets, to which they had access, would have been minimal due to the low interest rates then prevailing.

131.  In accordance with the Tribunal's power under Article 26.4 of the LCIA Rules and section 49 of the Arbitration Act 1996, the Tribunal has resolved to apply the rate of LIBOR plus 4%.  This is the rate stipulated in Article 18.2 of the 2006 Concession Agreement in the case of "*Delayed Payment of Termination Compensation*".  This contractual provision is not, *stricto sensu*, applicable to the damages claimed in this phase of the arbitration as the Claimants have elected to affirm the 2006 Concession Agreement rather than terminate it in accordance with the terms of Article 18. Nonetheless, the Claimants are claiming contractual damages for breaches of the 2006 Concession Agreement and the rate specified in Article 18.2 is a strong

---

[86]   Third Expert Report Spiller/Chavich, §19.

indication as to the rate of interest that the Parties considered to be appropriate to compensate for the time value of money more generally.

132.  The Tribunal has resolved to award interest at a rate of LIBOR plus 4% compounded annually in respect of DPWD's lost management fees and dividends, which, as of 31 March 2021, amounted to USD 0.4 million and USD 9.6 million respectively.[87]  The Tribunal has further resolved to award interest at the same rate, compounded annually, in respect of the period after 31 March 2021 until payment by the Respondent, in relation to DPWD's lost management fees and dividends, as well as DCT's lost onshore bank account balance.

133.  At the date of this award, the total amounts of interest that has accrued on this basis in relation to these three distinct losses are as follows:

133.1. DPWD's management fees – USD 1,775,755;

133.2. DPWD's dividends – USD 14,655,792;

133.3. DCT's onshore bank balance – USD 1,034,658.


# I    AWARD

134.  For the foregoing reasons, the Tribunal hereby:

134.1. Declares that the Republic has breached Articles 3.7 and 12.1.3(vi) by withholding dividends from DPWD as a "*Shareholder*";

134.2. Orders the Republic to pay DPWD the amount of USD 31,390,693 for the loss of management fees resulting from the Respondent's breach of Article 12.1.3(vi) of the 2006 Concession Agreement for the period 23 February 2018 to 31 December 2020;

134.3. Orders the Republic to pay DPWD the amount of USD 1,775,755 as interest on the amount awarded for DPWD's loss of management fees that has accrued as at the date of this Third Partial Final Award and declares that

---

[87]   Fifth Expert Report Spiller/Chavich, §15; CLEX-50.

interest will continue to accrue on the principal amount at the rate of LIBOR plus 4% compounded annually until payment by the Republic;

134.4. Orders the Republic to pay DPWD the amount of USD 116,772,715 for loss of dividends resulting from the Respondent's breach of Articles 3.7 and 12.1.3(vi) of the 2006 Concession Agreement for the period 23 February 2018 to 31 December 2020;

134.5. Orders the Republic to pay DPWD the amount of USD 14,655,792 as interest on the amount awarded for DPWD's loss of dividends that has accrued as at the date of this Third Partial Final Award and declares that interest will continue to accrue on the principal amount at the rate of LIBOR plus 4% compounded annually until payment by the Republic;

134.6. Orders the Republic to pay DCT the amount of USD 35,123,370 for the loss resulting from the Respondent's seizure of its onshore bank account at *Banque pour le Commerce et l'Industrie - Mer Rouge* (BCIMR), Djibouti, in breach of Article 12.1.3(vii) of the 2006 Concession Agreement;

134.7. Orders the Republic to pay DCT the amount of USD 1,034,658 as interest on the amount awarded for DCT's loss resulting from the seizure of its onshore bank account and declares that interest will continue to accrue on the principal amount at the rate of LIBOR plus 4% compounded annually until payment by the Republic;

134.8. Orders the Republic to pay any and all amounts due to DPWD to an account nominated by DPWD to receive such payment, such nomination to be communicated by DPWD to the Republic within seven days of the issuance of this Third Partial Final Award;

134.9. Orders the Republic to pay any and all amounts due to DCT to DCT's bank account held at Standard Chartered Bank in London, United Kingdom;

134.10.   Dismisses DCT's claim for lost cash flows representing the lost dividends due to PDSA;

134.11.   All other matters, including the issue of costs leading up to the issuance of this Third Partial Final Award, are reserved.

Seat of the arbitration: London, United Kingdom

Date:           20 January 2022


Signed:      _____
              Professor Zachary Douglas QC

              Sole Arbitrator